Filed 8/22/17

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yuba)

----

| | |
|---|---|
| CAL SIERRA DEVELOPMENT, INC., | C080397 |
| Plaintiff and Appellant, | (Super. Ct. No. CVCV110000630) |
| v. | |
| GEORGE REED, INC., et al., | |
| Defendants and Respondents; | |
| WESTERN AGGREGATES LLC, | |
| Cross-defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Yuba County, Stephen W. Berrier, Judge. Affirmed.

Radoslovich Parker Turner, Frank M. Radoslovich, Port J. Parker, Joseph F. Klatt and Myles G. Taylor for Plaintiff and Appellant.

Stoel Rives, Ryan C. Wood and Bao M. Vu for Defendants and Respondents.

Jeffer Mangels Butler & Mitchell, Joseph N. Demko, Kerry Shapiro and Matthew J. Sanders for Cross-defendant and Respondent.

1

This case arose from competing claims to a portion of the Yuba Goldfields. At issue is whether an arbitration award resolving a dispute between plaintiff Cal Sierra Development, Inc. (Cal Sierra), and Western Aggregates, Inc., serves as res judicata to bar Cal Sierra's lawsuit against Western Aggregates' licensee George Reed, Inc., and the licensee's parent Basic Resources, Inc. We conclude the answer is yes.

Plaintiff Cal Sierra's predecessor and Western Aggregates entered into a Mutual Operations Agreement (MOA) for the Yuba Goldfields. (In this context, an MOA is a mechanism to allow two mining companies to operate on the same property.) Pursuant to the MOA and accompanying deeds, Cal Sierra had the superior right to mine for precious metals, subject to certain exceptions; Western Aggregates had the subordinate right to the surface estate. Western Aggregates entered into a license agreement with George Reed, Inc. (Reed), permitting Reed to locate a mobile asphalt plant on the portion of the Yuba Goldfields known as the Deep Reserve. A dispute arose when Cal Sierra's gold mining dredge was on course to collide with the asphalt plant. Cal Sierra altered the dredge course and demanded arbitration to settle the dispute. The arbitration panel found for Cal Sierra on its claim of breach of contract, but found Cal Sierra failed to prove its tort claims of trespass, nuisance, and conversion.

After the arbitration was complete, Cal Sierra proceeded with its lawsuit against Reed and Basic Resources for trespass, intentional inference with contract, and negligent interference with economic relations. After a trial on the affirmative defenses of res judicata (claim preclusion) and collateral estoppel (issue preclusion), the court found res judicata applied and entered judgment for defendants. Cal Sierra appeals, contending defendants failed to establish the elements of res judicata and that the application of res judicata in this case is inequitable.

**FACTUAL AND PROCEDURAL BACKGROUND**

The Yuba Goldfields is a 10,000-acre valley on both sides of the Yuba River near Marysville. Cal Sierra mines for gold in the Yuba Goldfields using a dredge. The dredge

is part ship and part machine and the length of a football field; it moves along the surface of the water at three to six miles an hour, digging up the material in front of it to a depth of 100 feet. The material is sorted and tailings or aggregate are ejected behind the dredge. The path of the dredge is planned well in advance.

In 1992, Cal Sierra's predecessor entered into the MOA with Western Aggregates governing operations on the Yuba Goldfields. Under the MOA and associated deeds, Cal Sierra had the priority right to mine for precious metals and, subject to that priority right, Western Aggregates had the rights to the surface. There were certain exceptions to Cal Sierra's priority mining rights.

In 2009, Western Aggregates entered into a license agreement with Reed, an asphalt paving contractor. Pursuant to the license agreement, Reed installed an asphalt plant on the property known as the Deep Reserve on a site selected by Western Aggregates. The plant was mobile and not affixed to a solid foundation; it moved from location to location at great expense. The plant processed aggregate provided by Western Aggregates. The original license was temporary, only long enough for Reed to complete its contract to resurface Highway 99. A second agreement extended the license. Both license agreements contained a provision setting forth the relationship between Western Aggregates and Reed, stating: "Nothing contained in this Agreement shall be deemed or construed by the parties or by any third person to create the relationship of principal and agent or of partnership or of joint venture or of any association between Licensor and Licensee, and no provision contained in this Agreement or any act of the parties shall be deemed to create any relationship between Licensor and Licensee, other than the relationship of licensor and licensee."

In late 2009, it became clear that the path of Cal Sierra's dredge would eventually encounter Reed's asphalt plant. In a series of correspondence, the parties disputed whether the site of the asphalt plant had been excluded from Cal Sierra's priority mining rights. The dispute was not resolved, but Cal Sierra altered the path of the dredge to

avoid the asphalt plant and demanded arbitration under the provisions of the MOA. Reed wanted to participate in the arbitration but pulled out due to a scheduling conflict.

In the arbitration, Cal Sierra claimed "that its gold operation within the Yuba County Goldfields [] has been severely damaged as a result of the unauthorized presence of a George Reed, Inc. [] asphalt plant upon an area (rich with provable gold reserves) where Cal Sierra has predominant rights to mine." Cal Sierra sought damages under theories of breach of contract, trespass, nuisance, and conversion.

The scope of the arbitration was limited to "the parties' respective rights and obligations related to the current location of the [Reed] asphalt plant." The arbitration was conducted in two phases, merits and attorney fees. Due to time constraints, the arbitration panel did not produce a decision on the first phase, only a "check-the-box" form, similar to a special verdict. The three-member panel, with one dissent, found for Cal Sierra on breach of contract and awarded $6,209,781 in lost profits and $644,052 in mitigation costs (related to changing the dredge course). The panel found Cal Sierra had not proven trespass, nuisance, or conversion. In the second phase of the arbitration, the panel awarded Cal Sierra $991,119 in attorney fees and costs. Western Aggregates promptly paid the award.

Shortly after the demand for arbitration, Cal Sierra filed a complaint against Reed, its parent Basic Resources, and Western Aggregates' parent Eagle Materials, Inc. An amended complaint added Western Aggregates as a party. The trial court granted the motion to dismiss Western Aggregates and its parent on the basis of res judicata.

Cal Sierra filed a second amended complaint, the operative pleading at issue here, against Reed and Basic Resources, with claims for trespass, intentional interference with contract, and negligent interference with economic relations. The second amended complaint alleged that Reed was the alter ego of Basic Resources. It further alleged that at least one executive of Basic Resources knew of and acknowledged the superior mining

4

rights of Cal Sierra to the Deep Reserve. Notwithstanding this knowledge, Reed installed a portable asphalt plant within the Deep Reserve and refused to remove it.

Reed and Basic Resources filed a cross-complaint against Western Aggregates for breach of contract, negligent misrepresentation, and implied equitable indemnity. The cross-complaint alleged that Reed had inquired whether Cal Sierra's mining operations would interfere with the asphalt plant; Western Aggregates said no and that Reed "had nothing to worry about."

The trial court bifurcated the trial and in the first phase addressed defendants' affirmative defenses of res judicata and collateral estoppel. Over Cal Sierra's objection, Western Aggregates participated in the trial. Cal Sierra introduced evidence that Western Aggregates and Reed were separate companies. Western Aggregates did not receive revenue from the asphalt plant and did not provide insurance, workers compensation insurance, or trucking services for Reed; the two companies had separate entrances to the property.[1] Western Aggregates had no say over Reed's contracts and its personnel never operated the asphalt plant. Reed did not pay any portion of the arbitration award already paid by Western Aggregates.

The trial court ruled that res judicata (claim preclusion) applied to bar the action. It found the same claim (trespass) was involved in both the arbitration and the lawsuit; thus the final arbitration award served as a final judgment. The court found the same party or privity requirement (which we discuss *post*) applied only to the party against whom the defense of res judicata was asserted--in this case, Cal Sierra. As to the interference claims, which had not been raised in the arbitration, the court found the case involved derivative liability based on a single act--locating the asphalt plant--which *had* been addressed in the arbitration.

---

[1] The separate entrances were necessary because Western Aggregates was a union company and Reed was not.

5

After the trial had ended, the California Supreme Court clarified that for the claim preclusion aspect of res judicata, a complete identity of parties was required; the requirement of the same party or its privy applies to both the party asserting the defense and the party against whom the defense is asserted. (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 824-825 (*DKN Holdings*).) Based on this clarification in the law, Cal Sierra moved for judgment notwithstanding the verdict, a new trial, and to vacate the judgment, contending privity had not been established. The trial court found the license agreement between Western Aggregates and Reed was sufficient to establish privity. The court reiterated that the case was one of derivative liability.

Cal Sierra appealed. Both Western Aggregates and Reed filed respondents' briefs.

## DISCUSSION

### I

### *Res Judicata*

" 'Res judicata' describes the preclusive effect of a final judgment on the merits. Res judicata, or claim preclusion, prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them. Collateral estoppel, or issue preclusion, 'precludes relitigation of issues argued and decided in prior proceedings.' [Citation.] Under the doctrine of res judicata, if a plaintiff prevails in an action, the cause is merged into the judgment and may not be asserted in a subsequent lawsuit; a judgment for the defendant serves as a bar to further litigation of the same cause of action." (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896-897.)

Courts have at times used "res judicata" as an umbrella term, encompassing both the primary aspect of claim preclusion and the secondary aspect of issue preclusion. We will follow the current practice to use the term "claim preclusion" to describe the primary aspect of the res judicata doctrine and the term "issue preclusion" to denote collateral estoppel. (See *DKN Holdings, supra,* 61 Cal.4th at pp. 823-824.) The two types of preclusion have different requirements. (*Id*. at p. 824.)

6

"*Claim preclusion* 'prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them.' [Citation.] Claim preclusion arises if a second suit involves (1) the same cause of action (2) between the same parties (3) after a final judgment on the merits in the first suit. [Citations.] If claim preclusion is established, it operates to bar relitigation of the claim altogether. [¶] *Issue preclusion* prohibits the relitigation of issues argued and decided in a previous case, even if the second suit raises different causes of action. [Citation.] Under issue preclusion, the prior judgment conclusively resolves an issue actually litigated and determined in the first action. [Citation.] There is a limit to the reach of issue preclusion, however. In accordance with due process, it can be asserted only against a party to the first lawsuit, or one in privity with a party. [Citation.]" (*DKN Holdings, supra,* 61 Cal.4th at p. 824.)

Here we are concerned only with claim preclusion; we next examine whether defendants established each of the requirements to assert it as a bar to the instant action.

## II

### *Privity*

A. *The Law*

"Since [claim preclusion] bars a subsequent action on the same claim between, not only parties to the first action, but also their privies, we must determine who qualifies as a privy to a prior action. In *Bernhard v. Bank of America* (1942) 19 Cal.2d 807, Justice Traynor stated: 'Under the requirement of privity, only parties to the former judgment or their privies may take advantage of or be bound by it. [Citation.] A party in this connection is one who is "directly interested in the subject matter, and had a right to make defense, or to control the proceeding, and to appeal from the judgment." [Citations.] A privy is one who, after rendition of the judgment, has acquired an interest in the subject matter affected by the judgment through or under one of the parties, as by

7

inheritance, succession, or purchase. [Citations.]' (*Id*. at p. 811.)"[2] (*Rice v. Crow* (2000) 81 Cal.App.4th 725, 735.)

"[T]o maintain the stability of judgments, insure expeditious trials," prevent vexatious litigation, and "to serve the ends of justice," courts are expanding the concept of privity beyond the classical definition to relationships "sufficiently close to afford application of the principle of preclusion." (*People v. One 1964 Chevrolet Corvette Convertible* (1969) 274 Cal.App.2d 720, 731.) "As applied to questions of preclusion, privity requires the sharing of 'an identity or community of interest,' with 'adequate representation' of that interest in the first suit, and circumstances such that the nonparty 'should reasonably have expected to be bound' by the first suit. [Citation.] A nonparty alleged to be in privity must have an interest so similar to the party's interest that the party acted as the nonparty's ' " 'virtual representative' " ' in the first action. [Citation.]" (*DKN Holdings, supra,* 61 Cal.4th at p. 826.)

" 'This requirement of identity of parties or privity is a requirement of due process of law.' [Citation.] 'Due process requires that the nonparty have had an identity or community of interest with, and adequate representation by, the losing party in the first action. [Citations.] The circumstances must also have been such that the nonparty should reasonably have expected to be bound by the prior adjudication. . . . [¶] A nonparty should reasonably be expected to be bound if he had in reality contested the prior action even if he did not make a formal appearance,' for example, by controlling it. [Citations.] Furthermore, privity appertains 'against one who did not actually appear in the prior action . . . where the unsuccessful party in the first action might fairly be treated as acting in a representative capacity for a nonparty.' [Citation.]" (*Victa v. Merle Norman Cosmetics, Inc*. (1993) 19 Cal.App.4th 454, 464.) Because privity is a legal

---

[2] Cal Sierra incorrectly quotes *Rice's* definition of a party as the definition of a privy.

question involving due process, we review the trial court's determination of privity de novo. (*Ibid.*)

*DKN Holdings* explained that derivative liability establishes privity. "When a defendant's liability is entirely derivative from that of a party in an earlier action, claim preclusion bars the second action because the second defendant stands in privity with the earlier one. [Citations.] The nature of derivative liability so closely aligns the separate defendants' interests that they are treated as identical parties. [Citation.] Derivative liability supporting preclusion has been found between a corporation and its employees [citations], a general contractor and subcontractors [citation], an association of securities dealers and member agents [citation], and among alleged coconspirators [citation]." (*DKN Holdings, supra,* 61 Cal.4th at pp. 827-828.)

B. *Analysis*

Cal Sierra first contends there is no privity between Western Aggregates on the one hand and Reed and Basic Resources on the other because the latter two corporations are completely separate companies from Western Aggregates, as shown by the evidence at trial. Cal Sierra next contends the license agreements expressly preclude a finding of privity, because both agreements limited the relationship to that of licensor and licensee, disclaiming any other relationship. Cal Sierra argues privity requires the power to bind the other, such as principal and agent, and that power is missing in a licensor-licensee relationship.

First, the licensor-licensee relationship does not preclude a finding of privity. The parties have not cited to, and we have not found, any California case addressing privity for purposes of claim preclusion between a licensee and a licensor.[3] Federal courts have

---

[3] Respondents cite to *Kerr Land & Timber Co. v. Emerson* (1965) 233 Cal.App.2d 200, 225, in which the court found a license established privity between the licensor and

9

indicated a licensor-licensee relationship *may* establish privity for purposes of claim preclusion, although it does not as a matter of law. (See, e.g. *Erbamont*, *Inc. v. Cetus Corp*. (D.Del. 1989) 720 F.Supp. 387, 394-395 [stating in dicta, that there is a "strong possibility" that the relationship between licensor and licensee satisfies the definition of privity]; *Butterfield v. Oculus Contact Lens Co*. (N.D.Ill. 1971) 332 F.Supp. 750, 762 ["There certainly can be factual situations in which a licensor and licensee may be in privity but it does not follow that they always are"].)

That defendants Reed and its parent Basic Resources are separate companies from Western Aggregates is not determinative of the issue of privity. " 'Privity' as used in the context of res judicata or collateral estoppel, does not embrace relationships between persons or entities, but rather it deals with a person's relationship *to the subject matter of the litigation.* [Citation.]" (*Manning v. South Carolina Dep't of Highway & Public Transp*. (4th Cir. 1990) 914 F.2d 44, 48, italics added.) The subject matter of the litigation here was the same as that at the center of the arbitration dispute: the placement of the asphalt plant and whether it infringed on Cal Sierra's mining rights. As to this issue, Western Aggregates and Reed (and Basic Resources) had an identical interest; all were adversely and similarly impacted by the propriety (or impropriety) of the plant's location.[4] Reed's right to occupy the property was solely dependent on its license agreement; Reed acted with Western Aggregates' consent and Western Aggregates selected the exact location. Moreover, Reed did consider the arbitration binding on establishing the plant's permissible location. Edward Berlier, Reed's vice-president and

licensee. That case, however, did not involve claim preclusion or any aspect of res judicata.

[4] The identity of interest between Western Aggregates and Reed in the dispute with Cal Sierra and Western Aggregates' virtual representation of Reed in the arbitration is further illustrated by the fact that Western Aggregates filed a brief in support of Reed's interests in this appeal and asserts nearly identical arguments.

10

general manager, testified that Reed would have moved the plant if the arbitration panel had ordered it.

The trial court found this case involved derivative liability and *DKN Holdings* teaches that derivative liability is a form of privity. (*DKN Holdings, supra,* 61 Cal.4th at pp. 827-828.) Cal Sierra challenges that finding, contending derivative liability establishes privity for claim preclusion *only* where the first action was against the direct actor. Cal Sierra contends defendants' liability is not entirely derivative of Western Aggregates' liability; rather, Reed and Basic Resources *independently* infringed on Cal Sierra's property rights by installing the asphalt plant, refusing to move it, and causing materials incident to the product of asphalt to occupy the area.

The cases cited by *DKN Holdings* in its discussion of derivative liability do not support Cal Sierra's position that claim preclusion applies only where the first action is against the direct actor. For example, in *Lippert v. Bailey* (1966) 241 Cal.App.2d 376, 382, the plaintiff was precluded from suing insurance agents--the actual actors--after he settled with the insurance company for the same loss. In *Thibodeau v. Crum* (1992) 4 Cal.App.4th 749, 757, an arbitration award against the general contractor precluded a lawsuit against the subcontractors for their work. Here, Reed's liability (and that of its parent) is derivative of that of Western Aggregates because Reed acted *only* pursuant to the license agreement with Western Aggregates in installing the asphalt plant. Indeed, it was Western Aggregates who *selected* the site for the plant.

To the extent Cal Sierra is arguing that Reed committed independent torts outside the scope of the license agreement such that its liability is not derivative, we next consider that argument in the context of the requirement that the claims be identical.

11

II

*Identity of Claim*

A.  *Primary Right*

"Whenever a judgment in one action is raised as a bar to a later action under [claim preclusion], the key issue is whether the same cause of action is involved in both suits.  California law approaches the issue by focusing on the 'primary right' at stake: if two actions involve the same injury to the plaintiff and the same wrong by the defendant then the same primary right is at stake even if in the second suit the plaintiff pleads different theories of recovery, seeks different forms of relief and/or adds new facts supporting recovery."  (*Eichman v. Fotomat Corp.* (1983) 147 Cal.App.3d 1170, 1174.)

Under the "primary rights" theory adhered to in California, there is only a single cause of action for the invasion of one primary right and the harm suffered is the significant factor.  (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 954, disapproved on another point by *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 574, fn. 4.)  A primary right is the right to be free of a particular injury.  (See *Slater v. Blackwood* (1975) 15 Cal.3d 791, 795.)  "The cause of action is the right to obtain redress for a harm suffered, regardless of the specific remedy sought or the legal theory (common law or statutory) advanced."  (*Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 798.)

The arbitration panel found that Cal Sierra's claims of trespass and nuisance were not proven.  Nuisance and trespass address the same legal wrong and injury--interference with unimpaired ownership and undisturbed enjoyment of property--and thus were simply alternative legal theories for the invasion of a single primary right.  (*Rancho Viejo v. Tres Amigos Viejos* (2002) 100 Cal.App.4th 550, 562, fn. 6.)  Here, the primary right--adjudicated in the arbitration by the panel's finding that trespass and nuisance were not proved--was Cal Sierra's superior right to mine in the Deep Reserve without interference and Western Aggregates' duty not to interfere with that right.

B. *Trespass*

Cal Sierra contends a different primary right is involved in this case. "Cal Sierra had the right to not have its contractual rights or publically recorded property interests in the Deep Reserve interfered with or wrongly occupied by [Reed and Basic Resources]." Cal Sierra contends more "complex mutual duties" were involved in the arbitration, and defendants had "separate duties" not to interfere with Cal Sierra's contractual and property rights. Cal Sierra contends Reed had a separate duty not to interfere with Cal Sierra's mining rights because it was a stranger to the MOA. Our affirmance of the trial court's finding of privity refutes Cal Sierra's argument that Reed was a stranger to the relationship between Cal Sierra and Western Aggregates. Reed's alleged interference by installing and operating the asphalt plant was undertaken pursuant to a license agreement with Western Aggregates. This installation and operation of the asphalt plant was the *same interference* alleged in Cal Sierra's trespass claim against Western Aggregates, a claim rejected by the arbitration panel. Cal Sierra has failed to show how its rights or defendants' duties differed from those resolved in the arbitration.

Cal Sierra next contends a different primary right is involved because defendants' trespass was a continuing trespass that continued after the arbitration. A continuing trespass, however, requires an initial trespass. "The 'continuing nuisance' or 'continuing trespass' theory states that the injury caused by an abatable nuisance or trespass takes place at every continuation of the nuisance or trespass, each of which gives rise to a separate claim for damages." (*Chevron U.S.A. Inc. v. Superior Court* (1994) 44 Cal.App.4th 1009, 1017.) Because Cal Sierra cannot establish the necessary predicate of an initial trespass, its claim of continuing trespass is also barred.

Further, the issue of a continuing trespass was raised and resolved in the arbitration. In its demand for arbitration, Cal Sierra described the nature of the dispute, in part, as Western Aggregates' "permitting and/or continuing a trespass on [Cal Sierra's] subsurface rights." An attorney who represented Western Aggregates at the arbitration

13

testified Cal Sierra made a claim in the arbitration for continuing trespass because the asphalt plant was still in the disputed location.

C. *Interference Claims*

The second amended complaint alleged Reed and Basic Resources knew of Cal Sierra's contractual relationship with Western Aggregates relating to Cal Sierra's precious metal rights, and that defendants intended to disrupt Western Aggregates' full performance of its contractual obligations by inducing Western Aggregates to intentionally breach the agreement by allowing the asphalt plant. The complaint further alleged Reed and Basic Resources knew or should have known about Cal Sierra's superior right to mine within the Deep Reserve before installing the asphalt plant and placing asphalt waste within the Deep Reserve. Defendants failed to act with reasonable care by failing to inspect and analyze Cal Sierra's recorded precious metal rights and refusing to remove the asphalt plant and incidental materials, substantially disrupting Cal Sierra's contractual relationship with Western Aggregates. We refer to these claims as the interference claims.

Cal Sierra contends these interference claims are different causes of action than those resolved in the arbitration. Cal Sierra argues they were not and could not have been presented to the arbitration panel because Western Aggregates could not interfere with its own contract. (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 514.)

Respondents contend the interference claims involve the same primary right as the trespass claim. The arbitration resolved whether Cal Sierra's mining rights were infringed by the location of the asphalt plant. The arbitration panel concluded Western Aggregates did not trespass by allowing Reed to install and operate the asphalt plant. The interference claims were premised on Reed's purported trespassing by installing and operating the asphalt plant on that site. Cal Sierra's same primary right to enjoy its superior mining rights was at stake in both the trespass and the interference claims. If

14

Western Aggregates was not liable for trespass by allowing Reed to install and operate the asphalt mine, then Reed could not be liable--even under another theory--for the same actions: *installing and operating the asphalt plant*. "The plaintiff's primary right is the right to be free from a particular injury, regardless of the legal theory on which liability for the injury is based." (*Federation of Hillside and Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1202.) The interference claims were different theories of recovery, but they were based on the same primary right.

IV

*Final Judgment*

The third requirement of claim preclusion is a final judgment on the merits in the first action. (*DKN Holdings*, *supra*, 61 Cal.4th at p. 824.) A judgment confirming the arbitration award constitutes a final judgment on the merits. (*Sartor v. Superior Court* (1982) 136 Cal.App.3d 322, 328.) Cal Sierra contends defendants failed to establish this requirement because there was no final judgment on the arbitration award, only an order confirming it.[5]

"For purposes of res judicata, even an unconfirmed arbitral award is the equivalent to a final judgment." (*Bucur v. Ahmad* (2016) 244 Cal.App.4th 175, 186.) Cal Sierra dismisses *Bucur* and argues that a non-party to the arbitration can assert claim preclusion only on an arbitration award that has been reduced to a judgment.

Cal Sierra relies on *Kahn v. Pelissetti* (1968) 260 Cal.App.2d 832, which declined to treat an unconfirmed arbitration award as a final judgment for purposes of collateral estoppel. Kahn was a passenger on a city bus injured in an accident with Pelissetti, an

---

[5] Judgment should have been entered on the order. "An order confirming an award is to be reduced to a judgment." (*Rubin v. Western Mutual Ins. Co*. (1999) 71 Cal.App.4th 1539, 1545.) Code of Civil Procedure section 1287.4 provides: "If an award is confirmed, judgment shall be entered in conformity therewith."

uninsured motorist. Kahn filed a claim against her own automobile liability insurance policy under the uninsured motorist provisions. Her insurer disputed her claim, took the matter to arbitration, and prevailed. The insurer did not seek judicial confirmation of the award. Kahn then sued Pelissetti. The trial court upheld Pelissetti's use of the unconfirmed arbitration award as issue preclusion. The appellate court disagreed, "holding that an uninsured motorist cannot benefit from an unconfirmed award in favor of the injured person's insurance carrier."[6] (*Id.* at p. 833.)

The *Kahn* court framed the issue as "whether an unconfirmed award should be treated as though it were a final judgment." (*Kahn v. Pelissetti*, *supra*, 260 Cal.App.2d at p. 834.) Noting that an unconfirmed arbitration award has the same force and effect as a contract between the parties to the litigation, the court found Pelissetti was not a party to such contract, nor was he a third party beneficiary. (*Id.* at pp. 834-835.)

In *Thibodeau v. Crum, supra,* 4 Cal.App.4th 749, the appellate court distinguished *Kahn* and held an unconfirmed arbitration award could serve as the basis for issue preclusion. In *Thibodeau*, a homeowner arbitrated numerous construction deficiencies with the general contractor, failed to confirm the award, and then sued the subcontractor for cracks in the driveway. (*Id.* at pp. 753-754.) The *Thibodeau* court found *Kahn* was not controlling on the issue of whether issue preclusion could apply where the arbitration award had not been confirmed. "[T]he *Kahn* court did not hold that an unconfirmed arbitration award can never have a res judicata effect but only that it would not have such an effect under the particular circumstances of that case. We conclude that, under the particular circumstances of this case, the unconfirmed arbitration award should have a res judicata effect." (*Id.* at p. 761.) The circumstances were different because the general

---

[6] The Legislature subsequently codified this holding in Insurance Code section 11580.5.

16

construction contract anticipated the involvement of third parties and the subcontract was subject to the general construction contract. (*Ibid.*)

The difference between *Kahn* and *Thibodeau* is that in *Thibodeau* the party asserting the unconfirmed arbitration as issue preclusion was in privity, based on derivative liability, with a party to the arbitration. (*DKN Holdings*, *supra*, 61 Cal.4th at p. 828.) Here, as we have explained, Reed was in privity with Western Aggregates, a party to the arbitration. Just as the subcontractor could assert the unconfirmed arbitration award as issue preclusion in *Thibodeau,* Reed can assert the confirmed arbitration award as claim preclusion, even though the award was not reduced to a judgment.

Further, Western Aggregates has satisfied the arbitration award. By accepting the benefits of the award, Cal Sierra is precluded from challenging its finality. (See *Trollope v. Jeffries* (1976) 55 Cal.App.3d 816, 824 ["incongruous to hold that a party can accept the award and the payment thereunder and then attack the award on appeal"].)

The trial court did not err in finding all the requirements of claim preclusion were met. Because we determine the trial court correctly applied claim preclusion, we need not address the alternate argument that the judgment can be affirmed by the application of issue preclusion.

V

*Equities of Applying Claim Preclusion*

Cal Sierra contends that claim preclusion is an equitable doctrine and "it will not be applied so rigidly as to defeat the ends of justice or important considerations of policy." (*Greenfield v. Mather* (1948) 32 Cal.2d 23, 35.) Cal Sierra argues it is inequitable to apply claim preclusion here because it never had the opportunity to litigate its claims against Reed and Basic Resources. Cal Sierra could not bring them into the arbitration, so this lawsuit was the only vehicle to obtain recovery from them.

17

While *Greenfield* has not been overruled, our Supreme Court has considered it of "doubtful validity" and has noted "it has been severely criticized." (*Slater v. Blackwood, supra,* 15 Cal.3d at p. 796.)

In any event, we do not find the application of claim preclusion in this case to be inequitable. The issue of whether the installation and operation of Reed's asphalt plant constituted a trespass upon Cal Sierra's mining rights was arbitrated. There, Cal Sierra sought to recover the benefits obtained by Reed due to the alleged trespass. Thus, Cal Sierra had the opportunity and the incentive to fully litigate its claims against Reed in the arbitration. Cal Sierra insists the arbitration panel did not decide the trespass claim; however, as we have discussed, this assertion is incorrect. The arbitration award states that *trespass*, conversion, and private nuisance "were not proven."

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a).)


                                                          /s/
                                                     Duarte, J.


We concur:


    /s/
Robie, Acting P. J.


    /s/
Butz, J.