Filed 3/24/22  Musighi v. Mossighi CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ISAAC MUSIGHI,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>PARVIZ MOSSIGHI,<br><br>     Defendant and Respondent. | B310927<br><br>(Los Angeles County Super. Ct. No. 20STCP01325) |

APPEAL from an order of the Superior Court of Los Angeles County, Steven J. Kleifield, Judge. Affirmed.

Ecoff Campain Tilles & Kay, Lawrence C. Ecoff, and Alberto J. Campain for Plaintiff and Appellant.

Freeman, Freeman & Smiley, Curtis A. Graham, and Dawn B. Eyerly for Defendant and Respondent.

\* \* \* \* \* \*

Brothers Isaac Musighi (Isaac) and Parviz "Daniel" Mossighi (Daniel)[1] arbitrated the dissolution of their wholesale diamond business, and the trial court confirmed that arbitration award in a $9 million judgment for Daniel. The brothers thereafter reached a settlement resolving disputes related to Isaac's refusal to comply with the judgment. Still unhappy with the results of the arbitration, Isaac petitioned the trial court to compel 50 assorted claims to a new arbitration on the basis that the settlement agreement included an arbitration clause. The trial court denied the petition. Because the claims Isaac has identified on appeal are barred by res judicata, not encompassed within the scope of the arbitration clause, or cannot be arbitrated because the preselected arbitrator has a conflict of interest, the trial court was correct in denying the petition.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

#### A. *The brothers' business*

In the early 1980s, brothers Isaac and Daniel joined forces in the diamond wholesale business and created the company Pacific M. International Corp. (PMI). Isaac was the self-proclaimed "rainmaker," while Daniel handled the finances and

---

[1] Because the brothers share similar surnames and because their party designations changed throughout the proceedings, we use their first names for sake of clarity; we mean no disrespect.

customer service.  Over time, however, the brothers' relationship deteriorated, and they ultimately decided in 2013 to part ways.

### B.  *Dissolution of PMI*

#### 1.  *Initial arbitration*

To facilitate the dissolution of PMI, the brothers approached a senior member of the Diamond Club West Coast Inc., a professional organization for diamond merchants to which Isaac belongs, to arbitrate the terms of the dissolution.  PMI's accountant was later added as a co-arbitrator.  From 2013 to 2016, Isaac and Daniel signed three agreements to be "legally bound" to the decision of the arbitrators.  Isaac also acknowledged no less than three times that the arbitration would be "binding"; Isaac even suggested "hir[ing] a forensic accountant" as a "preliminary step[]" for the arbitration, but for whatever reason elected not to do so.

The arbitrators held a hearing in November 2016, and at the end of that hearing, the arbitrators auctioned off PMI as a company; Isaac outbid Daniel.  In December 2016, the arbitrators issued a "binding order" (initial arbitration award).  The initial arbitration award specifies that (1) Isaac owes Daniel $9,018,291 to be satisfied by Isaac's purchase of PMI for $800,000 and the balance paid in installments; (2) Daniel must "cease use of the [PMI] name immediately"; (3) each brother is to keep his own purchased inventory, except for a prized blue diamond to be held by Daniel but which the brothers are to work together in selling; (4) the brothers would split the funds held in one specified bank account; and (5) each brother is to be allocated specific outstanding accounts receivables.

### 2. *Further arbitration*

Dissatisfied with the initial arbitration award and believing it was based on undisclosed and inaccurate financial data Daniel had provided to the arbitrators, Isaac asked the arbitrators and Daniel to reopen the arbitration to consider "64 separate questions"; they agreed to do so. The brothers then signed a new agreement in April 2017 acknowledging that the further hearings would be "binding" and that "there is no right to further review."

The further hearings were held in April and May 2017 and the arbitrators issued an "amended binding order" in June 2017 (amended arbitration award). The amended arbitration award was identical to the initial arbitration award, except that (1) Isaac was to pay Daniel the $9,018,291 owed under an "adjusted" payment schedule, and (2) although the blue diamond was still to be owned equally by the brothers, Isaac was required to deliver it to Daniel within three days and the brothers were to (a) agree to sell the diamond to a third party (with the proceeds split equally) and (b) if a third party made an offer, any brother who refused to sell would have to buy out the other brother at the price offered by the third party.

### 3. *Confirmation of the amended arbitration award and entry of judgment*

In September 2017, Daniel petitioned the trial court to confirm the amended arbitration award.[2] Isaac opposed the petition and also moved to vacate the award, both on the ground that the award had been secured by fraud. After further briefing

[2] Daniel had filed a petition to confirm the initial arbitration award in February 2017, but filed an amended petition after the amended arbitration award was issued in June 2017.

4

and a hearing, the trial court in October 2017 entered a judgment confirming the amended arbitration award; the judgment ordered Isaac to pay $9,018,291 plus interest and to turn over the blue diamond to Daniel within seven days.

### C. *Efforts to enforce and collect on the judgment*

#### 1. *Isaacs' efforts to stymy enforcement and collection*

Apart from appealing the judgment itself, Isaac took affirmative steps to interfere with Daniel's efforts to enforce and collect on the judgment. Specifically, Isaac filed a shareholder's derivative action against Daniel and PMI, and also evaded postjudgment discovery (resulting in a court order compelling him to respond and imposing monetary sanctions).

Daniel was not deterred. He filed a creditor's suit against Isaac, Isaac's businesses, and Isaac's wife and family. Daniel also filed an application for a turnover order directing Isaac to deliver the blue diamond. The trial court granted that application and ordered Isaac to turn over the diamond within three days or face a contempt order. Instead of complying with the court order, however, Isaac flouted the order by shipping the blue diamond to New York on consignment for sale. The trial court set contempt trial for May 24, 2018.

#### 2. *Settlement of collection disputes*

As the day of Isaac's contempt trial approached, he enlisted Gary Barnett, an "old friend," to help him resolve all of the pending matters regarding enforcement and collection of the judgment. On the day before the contempt trial was to begin, Isaac and Daniel executed a "binding" settlement agreement (the enforcement agreement). As pertinent here, the enforcement agreement provided that (1) Daniel would agree to accept

5

approximately $2 million less from Isaac than the judgment required, and (2) both brothers would dismiss all of their pending lawsuits and appeals.  The enforcement agreement further provided that Isaac would satisfy his $7 million debt to Daniel as follows:  (1) Isaac and his wife would assign to Barnett their rights in $5 million worth of real estate in an investment "controlled by" Barnett, and Barnett would in turn pay Daniel $5 million within 90 days; (2) Isaac and his wife would pay $500,000 directly to Daniel (or more, if payment is delayed); (3) Isaac and his wife would give up their rights to half of the balance of a joint bank account; and (4) Isaac would give up his right to half of the blue diamond, but if Daniel sold the diamond during the two years after the settlement for more than $5 million, any amount over $5 million was to be split between the brothers.  The enforcement agreement also provided that (1) Daniel was to return five "Fancy Yellow . . . Radiant Cut" diamonds to Isaac; (2) any recovery from a pending "Custom's audit," as well as "legal fees and costs" incurred to pursue that audit, would be shared equally by the brothers; and (3) Isaac was to "own PMI, solely and exclusively."

Also as pertinent here, the enforcement agreement contains an arbitration clause stating that "[i]f issues arise between Isaac and [his wife], and Daniel, they agree that [Barnett] will be the sole and binding arbitrator of all such issues."

As required by the enforcement agreement, Isaac and Daniel dismissed all the pending proceedings against one another, Isaac and his wife assigned to Barnett their $5 million interest in the real estate venture, Isaac paid Daniel $500,000, Isaac relinquished his rights to the bank account, and Isaac handed over the blue diamond.

## II.    Procedural Background

On April 13, 2020, Isaac filed a verified petition in the trial court (1) to "set aside" the judgment, and (2) to compel a new arbitration of "approximately 50 issues" to revisit the dissolution of PMI based on a forensic audit Isaac had recently commissioned and which, in Isaac's view, revealed "embezzlement" by Daniel.[3] The petition itself only identified 13 of the issues; the rest were buried in a spreadsheet attached as an exhibit to Isaac's declaration in support of the petition.  Isaac sought to invoke the arbitration clause in the enforcement agreement.  Isaac maintained he was entitled to at least $28 million.

After further briefing and a hearing, the trial court denied the petition on January 20, 2021.  To the extent Isaac was attempting to overturn the amended arbitration award, the court ruled that Isaac's petition constituted both an untimely petition to vacate that award and an untimely motion for reconsideration. To the extent Isaac was attempting to initiate a new arbitration, the court ruled that the "particular controversies raised" in the petition "are not arbitrable" under the enforcement agreement's arbitration clause because that "clause applies to any disputes regarding the enforcement of the [enforcement] agreement"—that is, "for the collection of the judgment"—and the parties had "already satisfied the judgment," so there "there is nothing to be arbitrated" pursuant to that clause.

Isaac filed this timely appeal.

---

[3]    Isaac made a demand for this arbitration prior to filing the petition, which Daniel refused.

7

## DISCUSSION

Isaac argues that the trial court erred in denying his petition to compel arbitration. Because arbitration is a "'matter of consent'" (*Stolt-Nielsen S.A. v. AnimalFeeds Intl. Corp.* (2010) 559 U.S. 662, 681), a trial court may grant a petition to compel arbitration only if it determines that the controversy is within the ambit of the mutually agreed upon arbitration clause (Code Civ. Proc., § 1281.2; *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 830 (*Vandenberg*); *Douglass v. Serenivision, Inc.* (2018) 20 Cal.App.5th 376, 386 (*Douglass*)). To the extent the interpretation of that scope turns on disputed facts, we review for substantial evidence. (*Banner Entertainment, Inc. v. Superior Court* (1998) 62 Cal.App.4th 348, 357; *Vita Planning & Landscape Architecture, Inc. v. HKS Architects, Inc.* (2015) 240 Cal.App.4th 763, 772.) To the extent the interpretation turns on interpretation of the agreement to arbitrate or the application of law to undisputed facts, our review is de novo and we are not bound by the trial court's construction or interpretation. (*Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 684 (*Coast Plaza*); *Julian v. Glenair, Inc.* (2017) 17 Cal.App.5th 853, 864.)

The trial court did not err because the 19 "items and issues" that Isaac identifies on appeal as being subject to arbitration are (1) items he seeks to relitigate and which are thus barred by the doctrine of res judicata, (2) outside the scope of the arbitration clause, or (3) not subject to arbitration because the parties' designated arbitrator now has a conflict of interest that Daniel has refused to waive.[4]

---

[4] Furthermore, nearly all of the 19 "items and issues" Isaac has identified on appeal were not raised in his petition to compel

8

## I. Res Judicata

A claim is barred by res judicata if it "involves (1) the same cause of action (2) between the same parties (3) after a final judgment on the merits in" a prior proceeding. (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 824.) Once an arbitration award is reduced to a final judgment (and even when it is not), the doctrine of res judicata applies and prevents relitigation of that award. (*Cal Sierra Development, Inc. v. George Reed, Inc.* (2017) 14 Cal.App.5th 663, 678 (*Cal Sierra*); *Dial 800 v. Fesbinder* (2004) 118 Cal.App.4th 32, 50; *Bucur v. Ahmad* (2016) 244 Cal.App.4th 175, 186 (*Bucur*); *Vandenberg, supra*, 21 Cal.4th at pp. 831-832; *Sartor v. Superior Court* (1982) 136 Cal.App.3d 322, 328; see also Code Civ. Proc., § 1287.4 [judgment on arbitration award has same force and effect as judgment in civil action].) This bar reaches not only claims that were *actually* raised and litigated in the arbitration, but also those claims that *could have been* raised and litigated. (*Thibodeau v. Crum* (1992) 4 Cal.App.4th 749, 755; *Bucur*, at pp. 185-186; *Thompson v. Ioane* (2017) 11 Cal.App.5th 1180, 1191.)

Here, nearly all of the issues that Isaac claims must be compelled to a new arbitration are barred by res judicata. Specifically, the following claims Isaac identifies on appeal were either raised or could have been raised in the prior arbitration related to the dissolution of PMI: (1) "millions of dollars in unaccounted assets"; (2) the fact that "there was never a proper accounting of PMI's receivables performed during the [a]rbitration"; (3) "division of jewelry" between Isaac and Daniel,

arbitration, such that Isaac has waived the right to pursue them on appeal.

including 776 parcels of diamonds; (4) "$70 million of merchandise paid for by PMI [that] was not included in, discussed during, or allocated to one of the parties during the arbitration"; (5) "missing stones" worth "no less than $29[ million]," for which there are invoices but no inventory; (6) stones "switched" in PMI's computer files worth "no less than $800,000"; (7) diamonds "missing" from "PMI's old inventory lists" worth "no less than $650,000"; (8) articles of jewelry "deleted from PMI's computer files" worth "no less than $649,575"; (9) "missing stock numbers" associated with single stones worth "many millions of dollars"; (10) approximately $35 million in missing sales payments to PMI; (11) copies of invoices from two suppliers "closely tied to" Daniel necessary to identify missing diamonds; (12) Daniel's use of $1,080,000 of PMI's funds "to purchase commercial property"; (13) a vendor identified in the arbitration award (Grady Taylor) who refuses to pay an outstanding balance; (14) Daniel's forgery of Isaac's signature to obtain "SBA loans" in 2011 which caused Isaac and PMI to become "unwitting guarantors"; (15) Daniel's "continued" use of the PMI name; and (16) five "fancy yellow diamonds" Daniel has not returned.

Isaac responds with what boils down to six arguments as to why he should be able to relitigate all or some of his claims involving PMI's dissolution.

First, Isaac argues that the doctrine of res judicata should not be deemed to apply because he just discovered Daniel's fraud. This argument lacks merit. To begin, a party's discovery of "new evidence . . . is generally insufficient to avoid application" of res judicata. (*Direct Shopping Network, LLC v. James* (2012) 206 Cal.App.4th 1551, 1561-1562; *Cal Sierra*, *supra*, 14 Cal.App.5th at p. 675.) Further, Isaac's late discovery of Daniel's alleged

10

misdeeds is a product of Isaac's own dereliction. As noted above, Isaac knew that the dissolution discussions might benefit from a forensic review of PMI's books, but Isaac opted not to undertake that review until *after* the arbitration was completed and reduced to a judgment. Because "[a] party cannot by negligence or design withhold issues and litigate them in consecutive actions" (*Sutphin v. Speik* (1940) 15 Cal.2d 195, 202), we reject Isaac's efforts to take a third bite at the apple after the initial and reopened arbitrations.

Second, Isaac argues that the absence of a Civil Code section 1542 release in the enforcement agreement means that he may relitigate all issues, including those underlying the judgment. This argument lacks merit. In effect, Isaac is asserting that the absence of a section 1542 release creates an exception to res judicata. He cites no authority for this sweeping proposition. This is not surprising, as Civil Code section 1542 concerns a party's ability to release unknown (and hence unlitigated) claims as part of a settlement (*Casey v. Proctor* (1963) 59 Cal.2d 97, 109); it says nothing about rendering judgments meaningless unless they are accompanied by such a release.

Third, Isaac argues that the enforcement agreement by its terms "envisioned" a further arbitration as to "any lingering issues, disputes, or open items" regarding PMI's dissolution. But no such language appears in that agreement. To the contrary, Isaac specifically agreed in the April 2017 agreement for further arbitration of PMI's dissolution that "there is no right to further review" of the issues pertinent to the dissolution.

Fourth, Isaac argues that Daniel willingly accepted those terms of the enforcement agreement favorable to him (that is,

11

those giving him approximately $7 million in assets) and thus cannot avoid application of the terms unfavorable to him (that is, the arbitration clause). (*Harris v. Superior Court* (1986) 188 Cal.App.3d 475, 479 [acceptance of contract benefits constitutes consent to all obligations in contract]; *NORCAL Mutual Ins. Co. v. Newton* (2000) 84 Cal.App.4th 64, 84; see generally, Civ. Code, § 1589.) While this maxim obligates parties to take "the good parts with the bad parts" of a contract, it does not preclude them from asserting that "the bad part" of a contract is legally inapplicable to a particular dispute; that is all Daniel has done here in arguing that further arbitration of PMI's dissolution is barred by res judicata, that the enforcement agreement's arbitration clause does not reach issues beyond those concerned with enforcement and collection of the judgment, and that the anointed arbitrator is fatally conflicted.

Fifth, Isaac argues that the general public policy favoring arbitration mandates that he is entitled to a new arbitration of all issues arising out of PMI's dissolution. Isaac is correct that California has a strong policy favoring arbitration (*Coast Plaza*, *supra*, 83 Cal.App.4th at p. 686), but he is wrong that that policy requires us to jettison the doctrine of res judicata in favor of endless relitigation of issues that were—or could have been— litigated before.

Lastly, Isaac more narrowly argues that res judicata does not apply to two of the 16 issues listed above—namely, Daniel's "continued" use of PMI's name, and Daniel's retention of five "fancy yellow diamonds"—because those issues could not have been litigated during the arbitrations involving PMI's dissolution. Whether or not those two issues *as articulated on appeal* might fall outside the ambit of PMI's dissolution, they were not so

12

articulated in Isaac's petition as considered by the trial court.   In his petition, Isaac complained about Daniel's use of the PMI name "for many months" after the 2016 auction of the name, including "well into 2017."  And in his petition, Isaac complained about Daniels retention of a different yellow diamond.  Isaac cannot now, for the first time on appeal, object to Daniel's use of PMI in a different, later time frame or object to his failure to return different gemstones.  (*Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550, 564 [""""[I]t is fundamental that a reviewing court will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court.""""" ]; *Newton v. Clemons* (2003) 110 Cal.App.4th 1, 11 [reviewing court will "'ignore arguments, authority, and facts not presented and litigated in the trial court'"].)

## II.    Scope of the Arbitration Clause

A valid agreement to arbitrate, like any contract, rests upon """"mutual assent"""" (*Esparza v. Sand & Sea, Inc.* (2016) 2 Cal.App.5th 781, 788), which is evaluated """"objective[ly]"""" by looking to """"the reasonable meaning of [the parties'] words and acts, and not their unexpressed intentions or understandings"""" (*Harris v. TAP Worldwide, LLC* (2016) 248 Cal.App.4th 373, 381). Only disputes that fall within the scope of an arbitration provision are arbitrable.  (*Elijahjuan v. Superior Court* (2012) 210 Cal.App.4th 15, 20.)  In other words, "'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'"  (*AT&T Technologies v. Communications Workers* (1986) 475 U.S. 643, 648; see also Civ. Code, § 1648 ["However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties

13

intended to contract.'"].)  The scope of an arbitration provision must be examined "in context" and "with regard to its intended function."  (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1265.)  The party moving to compel arbitration bears the burden of producing "prima facie evidence of a written agreement to arbitrate" the specific claim at issue.  (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 413; *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236.)

Although the arbitration clause in the enforcement agreement states that Barnett "will be the sole and binding arbitrator of all such issues" if any issues arise, we decline Isaac's invitation to read that language in the abstract to reach *each and every* issue that has in the past or might in the future arise between the brothers during their lifetimes.  That is because that language, viewed objectively and in context, reaches only those disputes between Isaac and Daniel concerning compliance with the terms of the enforcement agreement.  The clause was part and parcel of that specific agreement, which was reached on the eve of Isaac's contempt trial with the purpose of resolving the parties' pending disputes over enforcement and collection of the judgment on the amended arbitration award.  Daniel was entitled to a significant sum of money and agreed to accept $2 million less to resolve the protracted collections litigation.  The enforcement agreement also resolved pending matters in which PMI was involved to ensure that the brothers shared equally in any loss or recovery (such as PMI's pending creditor's claim in a bankruptcy, PMI's pending lien on a piece of real property, and PMI's pending dispute with U.S. Customs).  To read the clause as Isaac suggests is to rip it out of the very context that gave it birth; to do so would

14

be contrary to the law.  (See Civ. Code, § 1647 ["A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates."].)

Properly construed, the clause does not reach two of the three the claims Isaac correctly identifies on appeal as being outside the dispute regarding PMI's dissolution (and hence outside the reach of res judicata):  (1) "personal family issues," including Daniel owing Isaac more than $1 million "in personal loans" and owing Isaac half of $558,000 in "personal expenses [Isaac] paid on behalf of their parents"; and (2) Daniel's postarbitration acts in "corrupt[ing] and alienat[ing] [Isaac's] business and customer relationships with several well-known jewelers."  Neither of these claims concerns enforcement or collection of the judgment.

Isaac resists this conclusion with three further assertions.

First, he asserts it is for the arbitrator—not the trial court—to decide whether a particular claim falls within the ambit of an arbitration clause.  He is wrong.  Unless the contract "clearly and unmistakably" delegates the question of arbitrability to the arbitrator, that threshold task is for the trial court to decide.  (*Sandoval-Ryan v. Oleander Holdings LLC* (2020) 58 Cal.App.5th 217, 222-223; *Douglass*, *supra*, 20 Cal.App.5th at pp. 386-387; *Rodriguez v. American Technologies, Inc.* (2006) 136 Cal.App.4th 1110, 1123; *Dream Theater, Inc. v. Dream Theater* (2004) 124 Cal.App.4th 547, 552.)  The enforcement agreement here does not assign that task to Barnett (who is the sole arbitrator the agreement designates), so the default rule applies and it is for the trial court to decide the issue of arbitrability.

Second, Isaac asserts that the arbitration clause must broadly apply to "resolve all family matters" because Isaac's wife

was included as a party to the enforcement agreement. This assertion ignores that Isaac's wife was a party, not due to her family ties, but because she was a co-owner of Isaac's assets that were subject to collection and because she had been sued by Daniel as part of his then-pending creditor's suit.

Lastly, Isaac asserts that several canons of contractual interpretation—some of which do not even apply to the facts here[5]—dictate that the arbitration clause must be given the broadest possible interpretation. Isaac's assertions rest on a misapplication of those canons. Properly applying those canons and evaluating the arbitration clause objectively, Isaac's claims regarding personal family matters and business torts are not within the scope of the enforcement agreement's arbitration clause for the reasons stated above. (See, e.g., Civ. Code, §§ 1636, 1638, 1639, 1641, 1647.) To accept Isaac's position that the clause reaches the two disputes not subject to res judicata, we would have to rewrite the parties' agreement; this we will not do. (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1143 (*Sonic-Calabasas*); *Series AGI West Linn of Appian Group Investors DE, LLC v. Eves* (2013) 217 Cal.App.4th 156, 164 ["courts will not rewrite contracts to relieve parties from bad deals nor make better deals for parties than they negotiated for themselves"].)

## III. Arbitrator's Conflict of Interest

An arbitrator is disqualified if he has a financial interest in the subject matter of the proceeding or in a party to the

_____

**5** For instance, Isaac cites the canon that a contract should be interpreted against the drafter (*Sandquist v. Lebo Automotive, Inc.* (2016) 1 Cal.5th 233, 248), but it is undisputed that Barnett drafted the agreement, not Daniel.

proceeding or if "a person aware of the facts might reasonably entertain a doubt that the [arbitrator] would be able to be impartial." (Code Civ. Proc., §§ 1281.91, subd. (d); 170.1, subd. (a)(3), (a)(6)(A)(iii).)

Here, Barnett—the person Isaac and Daniel identified as the "sole and binding arbitrator"—is disqualified from serving as arbitrator. As noted above, the brothers agreed that Isaac would transfer $5 million of a joint investment with Barnett to Barnett so that Barnett could then pay Daniel that full amount within 90 days. As it turns out, however, Barnett only paid Daniel $3 million; over one year after the agreed-upon due date, Barnett still owes Daniel $2 million. This outstanding debt renders Barnett disqualified for two reasons. First, Barnett's indebtedness to Daniel regarding a portion of the money owed to settle the dispute between Isaac and Daniel means that Barnett has a financial interest in the outcome of the continued arbitration of that very same dispute. Second, Barnett's indebtedness creates an incentive for him to issue a monetary award in favor of Isaac because it would extinguish Barnett's debt to Daniel, which is derivative of Isaac's debt. Under these circumstances, "an objective, reasonable person aware of the[se] facts reasonably could entertain a doubt that [Barnett] could be impartial" in a future arbitration. (*Speier v. The Advantage Fund, LLC* (2021) 63 Cal.App.5th 134, 148.) What is more, these grounds for disqualification exist regardless of whether Barnett's reasons for withholding the $2 million was to "determin[e] . . . unresolved issues discussed in the [enforcement] agreement" (as Isaac contends) or because Barnett lacked the funds to pay Daniel the $2 million (as Daniel contends). Thus, the only claim Isaac asserts on appeal that is not barred by res judicata and is

17

within the scope of the enforcement agreement's arbitration clause—namely, whether Daniel has complied with the enforcement agreement's mandate regarding the still-pending audit by U.S. Customs—is not subject to arbitration due to the arbitrator's disqualification. (See *People v. Zapien* (1993) 4 Cal.4th 929, 976 [noting "firmly established" rule that appellate courts review the trial court's ruling, not its rationale].)

To be sure, a party must timely move to disqualify an arbitrator with a conflict. (Code Civ. Proc., § 1281.91, subds. (b), (c).) Here, however, Daniel has already argued that Barnett "cannot act as an arbitrator of any dispute between the parties" due to this "unresolvable conflict." It would be pointless to remand Isaac's petition to compel arbitration of the U.S. Customs claim for further proceedings in the trial court when it is a foregone conclusion that, so long as Barnett owes Daniel money, he is disqualified from serving as an arbitrator. (*Ena North Beach, Inc. v. 524 Union Street* (2019) 43 Cal.App.5th 195, 215 [remand unnecessary where "the result of a remand is a foregone conclusion"]; *Stafford v. People* (1956) 144 Cal.App.2d 79, 82 ["It would be an idle act to remand the case to the trial court for further proceedings when . . . plaintiff could not in any event prevail through any further proceedings in that court"].)

Isaac raises two contentions in response.

First, he contends that the parties waived any conflict of interest by selecting Barnett in the first place. He is wrong. Although the parties agreed that Barnett would hold $5 million in escrow for 90 days, they did not contemplate that Barnett would retain any funds *beyond* that agreed-upon deadline. Indeed, Isaac's own petition acknowledges that Barnett withheld

18

the $2 million "on his own volition."  Thus, the parties did not waive the conflict.

Second, Isaac contends that the trial court may simply appoint a different arbitrator.  (See Code Civ. Proc., § 1281.6.)  His argument is not faithful to the parties' agreement.  To be sure, the governing statute permits a trial court to "appoint[] an arbitrator" where the parties do not have an "agreed method" for selecting an arbitrator, where "the agreed method fails or for any reason cannot be followed," or where "the arbitrator appointed fails to act."  (*Ibid.*)  But here, the parties did not agree upon a *method*; instead, they agreed to have Barnett serve as *the* "sole and binding arbitrator."  As written, the arbitration clause effectively says:  Barnett or no one.  Because arbitration exists only by virtue of the parties' consent, we cannot rewrite the clause to insert a backup plan of appointing someone else when that plan is one to which the parties themselves never consented.  (*Sonic-Calabasas*, *supra*, 57 Cal.4th at p. 1143.)

19

# DISPOSITION

The order is affirmed.  Daniel is entitled to his costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.

HOFFSTADT


We concur:


_____, Acting P. J.

ASHMANN-GERST


_____, J.

CHAVEZ