Filed 2/6/20
*See dissenting opinion*

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| LYNN GRANDE,<br>    Plaintiff and Respondent, | E068730 |
| v. | (Super.Ct.No. RIC1514281) |
| EISENHOWER MEDICAL CENTER,<br>    Defendant; | OPINION |
| FLEXCARE, LLC,<br>    Intervener and Appellant. | |
| | E068751 |
| EISENHOWER MEDICAL CENTER,<br>    Petitioner, | (Super.Ct.No. RIC1514281) |
| v. | |
| THE SUPERIOR COURT OF<br>RIVERSIDE COUNTY,<br>    Respondent; | |
| LYNN GRANDE,<br>    Real Party in Interest. | |

APPEAL from the Superior Court of Riverside County. Sharon J. Waters, Judge.

Affirmed.

ORIGINAL PROCEEDINGS; petition for writ of mandate. Sharon J. Waters,

Judge. Petition denied.

1

Downey Brand, Cassandra M. Ferrannini, and Bradley C. Carroll for Intervener and Appellant.

The Dion-Kindem Law Firm and Peter R. Dion-Kindem; The Blanchard Law Group and Lonnie C. Blanchard, III for Plaintiff, Respondent, and Real Party in Interest.

Sheppard, Mullin, Richter & Hampton, Richard J. Simmons, and Ruben D. Escalante as Amicus Curiae on behalf of Defendant and Petitioner Eisenhower Medical Center.

No appearance for Respondent.

FlexCare, LLC (FlexCare), a temporary staffing agency, assigned Lynn Grande to work as a nurse at Eisenhower Medical Center (Eisenhower). According to Grande, during her employment at Eisenhower, FlexCare and Eisenhower failed to ensure she received her required meal and rest breaks, wages for certain periods she worked, and overtime wages.

Grande was a named plaintiff in a class action lawsuit against FlexCare brought on behalf of FlexCare employees assigned to hospitals throughout California. Her own claims were based solely on her work on assignment at Eisenhower. FlexCare settled with the class, including Grande, and Grande received $162.13 for her injuries, plus a class representative incentive bonus of $20,000. Grande executed a release of claims, and the trial court entered a judgment incorporating the settlement agreement.

About a year later, Grande brought a second class action alleging the same labor law violations, this time against Eisenhower, who was not a party to the previous lawsuit. FlexCare intervened in the action asserting Grande could not bring the separate lawsuit against Eisenhower because she had settled her claims against them in the prior class action.

2

The trial court held a trial limited to questions as to the propriety of the lawsuit, and ruled Eisenhower was not a released party under the settlement agreement and could not avail itself of the doctrine of res judicata because the hospital was neither a party to the prior litigation nor in privity with FlexCare.

Eisenhower filed a petition for a writ of mandate and FlexCare appealed the trial court's interlocutory order. We affirm the trial court and deny the petition because Eisenhower and FlexCare were not in privity, preventing Eisenhower from blocking Grande's claims under the doctrine of res judicata, and Eisenhower was not a released party under the settlement agreement.

# I

# FACTS

A.  *The Parties and the Lawsuits*

FlexCare is a temporary nurse staffing agency which employs nurses and assigns them to work on a temporary basis as supplemental staff at California hospitals. FlexCare serves nearly 200 hospitals in California, and Eisenhower was one of those clients. FlexCare employed Grande and assigned her to Eisenhower, where she worked from February 6 to February 14, 2012.

FlexCare and Eisenhower defined their respective relationships to the temporary nurses in a contract called a staffing agreement. According to the agreement, nurses were employees of FlexCare and not employees of the hospital. The agreement gave FlexCare "exclusive and total legal responsibility as the employer of Staff . . . includ[ing], but not . . . limited to, the obligation to ensure full compliance with and satisfaction of (l) all state and

3

federal payroll, income and unemployment tax requirements, (2) all state and federal wage and hour requirements, (3) all workers' compensation insurance requirements, (4) overtime, premium pay and all employee benefits, and (5) all other applicable state and federal employment law requirements arising from [FlexCare's] employment of Staff, the assignment of Staff to [Eisenhower] and/or the actual work of Staff at [Eisenhower]." FlexCare was also responsible for screening candidates for placement and ensuring they met certain minimum standards.

However, Eisenhower maintained control over the temporary nurses in the performance of their jobs. The hospital assessed their competency during an orientation program. The hospital also could require nurses to take its medication and clinical skills test. It also retained discretion to make decisions about the nurses' assignments and to terminate nurses for poor performance. Finally, the agreement required nurses to conform with hospital policies and procedures.

Under the staffing agreement, Eisenhower paid FlexCare based on the hours the temporary nurses worked. FlexCare in turn paid nurses under their separate travel nurse agreements. The staffing agreement required temporary nurses to use the hospital's time and attendance system. The travel nurse agreement required Grande to report her hours worked to FlexCare after obtaining approval from Eisenhower. Specifically, the contract said she must "accurately report actual hours worked and fax or e-mail time sheet weekly with appropriate facility representative and Consultant signature."

The rate schedule attached to the staffing agreement provided Eisenhower would pay FlexCare $71 per hour for registered nurses, plus overtime of $20 per hour for hours worked

4

in excess of 12 hours in a day. Under the travel nurse's agreement, FlexCare would pay Grande a base rate of $26.40 per hour, $39.60 per hour for hours worked over 40 hours in a week, and $50 per hour after working 48 hours in a week. She was also to receive a $497 weekly meals and incidentals per diem and a weekly housing per diem of $805. Her per diem payments could be reduced if she failed to work at least 48 hours per week.

The staffing agreement also purported to define the relationship between FlexCare and Eisenhower. First, it stipulated there was no agency relationship between the parties. "[FlexCare] is performing the services and duties hereunder as an independent contractor and not as an employee, agent, partner of or joint venture with Hospital. Hospital retains professional and administrative responsibility for the services rendered." Second, the agreement required FlexCare to indemnify Eisenhower under certain circumstances—for claims and losses in connection with any FlexCare breach of the agreement or violation of statute or regulation, except those resulting from FlexCare's negligence,[1] as well as for claims and losses predicated on a finding temporary nurses were joint employees of FlexCare and Eisenhower.

After her assignment with Eisenhower ended, Grande brought claims for wage and hour violations, first against FlexCare, and later—separately—against Eisenhower. In both cases, she alleged failures on the part of the defendants to pay wages earned, to provide

---

[1] The provision is not a paragon of contractual draftsmanship. It says FlexCare agrees "to indemnify and hold harmless Hospital . . . from any and all claims, losses, demands, fees, attorneys fees or expenses, causes of action, costs, damages, and expenses . . . resulting from or arising in connection with any breach by [FlexCare] of any provision of this Agreement, the violation of any statute, rule, regulation, or order or an intentional, reckless, or negligent act or omission by [FlexCare], other than [those] that arise out of or are attributable to the negligent act or omission of [FlexCare]."

lawful meal and rest periods, to pay wages for meal and rest periods, to pay waiting time wages, and to provide required itemized wage statements. Both complaints alleged violations of various provisions of the Labor Code and violations of the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200) with the labor violations as predicates.

Both cases were purported class actions. In the first, filed in Santa Barbara County Superior Court by a coplaintiff on January 30, 2012, the named plaintiffs purported to represent all persons who were nonexempt nursing employees of FlexCare beginning January 30, 2008. The class consisted of all nurses FlexCare employed and assigned to work at any health care facility in California. The original named plaintiff was employed by FlexCare and assigned to work at the Lompoc Valley Medical Center, and based her claims on her treatment during that assignment. The complaint in the Santa Barbara action was amended to add Grande as a named plaintiff, and her allegations were based on her employment at Eisenhower. But Eisenhower didn't intervene and was never made a defendant in the Santa Barbara case.

In December 2015, Grande filed a second putative class action in Riverside County Superior Court, this time alleging claims against Eisenhower. In the Riverside case, Grande purported to represent all persons who were "non-exempt employees who were staffed by [Eisenhower] through third party registries, temporary employment services, temporary employment agencies, staffing agencies and services, or other employment agencies." Thus, in contrast to the Santa Barbara case, the class consisted of all nurses *any staffing agency* employed and assigned to work specifically *at Eisenhower*. The class period differed too; in the Riverside case it covered claims arising from December 2011 to the date of trial. Like

the Santa Barbara case, however, Grande's individual claims were based on her work at Eisenhower from February 6 to February 14, 2012, and asserted a UCL claim based on the same predicate wage and hour violations. Neither FlexCare nor any other staffing agency was named as a defendant.

B. *Settlement of the Santa Barbara Case*

The Santa Barbara case settled before the Riverside case commenced. In January 2014, the parties entered an agreement under which FlexCare agreed to pay up to $750,000 to the class. The settlement included a stipulation that Grande and her coplaintiff represented a certified class of "[a]ll persons who at any time from or after January 30, 2008 through the date of Preliminary Approval were non-exempt nursing employees of FlexCare, LLC employed in California." After the claims administration process, FlexCare paid approximately $700,000. Grande signed the settlement agreement and received $20,000 as a representative incentive award plus $162.13 (net of taxes) as a class member. The settlement was incorporated into a final judgment on April 8, 2015.

The final judgment ordered "the Released Claims of each and every Class member and Settlement Class Member, respectively, are and shall be deemed to be conclusively released as against the Released Parties," and "All Class members, as of the Effective Date, are hereby forever barred and enjoined from prosecuting Released Claims against the Released Parties." The agreement defines the "Released Claims" as "any and all claims . . . which have been or could have reasonably been asserted in the [Santa Barbara] Action or in any other state or federal court, administrative tribunal, or in arbitration or similar

7

proceeding, based upon, or arising out of, or related to the allegations in the [Santa Barbara] Action during the Class Period."

The settlement named as "Released Parties" FlexCare and the other named defendants, who were affiliates and officers of FlexCare. The settlement also included standard language releasing the named defendants' "present and former subsidiaries, affiliates, divisions, related or affiliated companies, parent companies, franchisors, franchisees, shareholders, and attorneys, and their respective successors and predecessors in interest, all of their respective officers, directors, employees, administrators, fiduciaries, trustees and agents, and each of their past, present and future officers, directors, shareholders, employees, agents, principals, heirs, representatives, accountants, auditors, consultants, insurers and reinsurers, and their counsel of record." The settlement did not release Eisenhower or any other client of FlexCare by name, nor did it release the category of FlexCare's clients.

An attorney for the Santa Barbara plaintiffs later testified FlexCare's potential liability in the Santa Barbara action was "in excess of $10 million" and said FlexCare's counsel provided evidence to plaintiffs' counsel showing "they would not have the ability to pay any large judgment substantially in excess of the settlement amount." The plaintiffs agreed to the lesser settlement amount of $750,000, based on FlexCare's "financial viability." The settlement contains a statement that, in addition to the standard concerns about the expense, duration, and uncertainty of litigation, the "Named Plaintiffs and Class Counsel also have taken into account . . . the difficulties and delays inherent in such litigation, including the financial ability of the Defendants to respond to any judgment that

8

may be obtained against them if the claims are successful." An attorney for the Santa Barbara plaintiffs later testified his clients did not intend to release Eisenhower. However, a FlexCare representative testified he did intend the release to extend to Eisenhower. He said the release was intended to mean FlexCare was "done with this . . . done with all of it for everybody."

C. *The Dispute Over the Effect of the Santa Barbara Settlement on this Case*

A month after Grande filed this case, Eisenhower demanded FlexCare indemnify it against her claims. Eisenhower's counsel sent FlexCare a letter along with the complaint and the staffing agreement between the two companies. They pointed out FlexCare "expressly agreed to 'hold [Eisenhower] harmless, pay the entire cost of [Eisenhower's] legal defense, and fully indemnify [Eisenhower] against any and all legal claims asserted against [Eisenhower] or [Eisenhower's] employees, and/or liability imposed against [Eisenhower] or [Eisenhower's] employees that are predicated in any matter [*sic*] on a finding by any court, enforcement agency, government entity, arbitrator or other adjudicator that Staff are joint employees of [FlexCare] and [Eisenhower].'" Eisenhower asserted Grande's claims were based on both companies' "alleged failure to fulfill its obligations under the Labor Code as Plaintiff's and other proposed class members' joint employers," and therefore "request[ed] that FlexCare indemnify and hold Eisenhower harmless for the claims made against it by Plaintiff, including the payment of its defense costs," under the terms of their staffing agreement.

FlexCare intervened in the Riverside case and sought a declaration that (1) Eisenhower was a released party under the Santa Barbara settlement and (2) the

9

judgment in Santa Barbara precludes Grande's causes of action against Eisenhower in Riverside. On Eisenhower's motion, the trial court bifurcated the released party and res judicata issues from all other issues and held a limited bench trial.

After trial, the court ruled Eisenhower was not a released party. The court reached that conclusion based on the language of the settlement, which did not mention Eisenhower or the category of FlexCare's hospital clients. Instead, the settlement named FlexCare, its officers and a corporate alter ego, and then added standard settlement language to release general categories of people and groups, like affiliated companies, principals or agents of FlexCare. The court held Eisenhower didn't fit any of these categories; most pertinent to this appeal, the court concluded Eisenhower was not a "related or affiliated company" or an "agent" of FlexCare under the Released Parties clause of the settlement.

The court also ruled Grande's claims against Eisenhower were not barred by res judicata because Eisenhower was not in privity with FlexCare. It noted the complaint alleged the two companies were joint employers, who typically are jointly and severally liable. The agreement also indicates independent, but joint and several liability. Since the Supreme Court had recently held joint and several obligors are not considered to be in privity for purposes of res judicata, the court concluded FlexCare and Eisenhower weren't in privity and res judicata didn't preclude Grande's second lawsuit against Eisenhower. The court therefore entered judgment in favor of Grande and against FlexCare on FlexCare's complaint in intervention.

FlexCare appealed. At Eisenhower's request, the trial court certified its statement of decision as appropriate for writ review. (Code Civ. Proc., § 166.1.) Eisenhower filed a

10

petition for writ of mandate. This court stayed proceedings in the trial court and consolidated the appeal with the writ proceeding.

## II

## ANALYSIS

FlexCare and Eisenhower found their arguments for reversal on the claim that the trial court erred in concluding Eisenhower was neither an affiliated company nor an agent of FlexCare. They argue the companies' relationship establishes both that Eisenhower was a released party under the agreement and that the parties were in privity. They argue that means the judgment in the Santa Barbara case both bars (under the settlement) and precludes (under res judicata) Grande's claims against Eisenhower in this case.

"In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo, and we review the trial court's findings of fact for substantial evidence." (*Durante v. County of Santa Clara* (2018) 29 Cal.App.5th 839, 842.) We liberally construe findings of fact "to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings." (*Ibid.*)

11

A.  *Res Judicata Does Not Apply Because the Companies Are Not in Privity*

According to the Restatement Second of Judgments, a "judgment against one person liable for a loss does not terminate a claim that the injured party may have against another person who may be liable therefor." (Rest.2d Judg., § 49.) "When the claimant thus brings consecutive actions against different persons liable for the same harm, the rendition of the judgment in the first action does not terminate the claims against other persons who may be liable for the loss in question. The judgment itself has the effect of officially confirming the defendant's obligation to make redress, an obligation which under the substantive law co-exists with that of the other obligor. No reason suggests itself why the legal confirmation of one obligation should limit or extinguish the other." (*Id.*, com. a.)

Our Supreme Court recently recognized this as "a bedrock principle of contract law." (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 818 (*DKN*).) "Parties who are jointly and severally liable on an obligation may be sued in separate actions." (*Ibid.*) "It has long been settled that contracting parties who are severally liable, or subject to joint and several liability, may be sued in the same action *or in separate actions* at the plaintiff's option. [Citations.] The plaintiff 'does not lose the right to the several liability of a several obligor until the obligation is fully satisfied,' notwithstanding that he may have obtained a judgment against other severally liable obligors." (*Id.* at p. 820.) The rule is not limited to contract claims. "The rule that there are separate claims against each obligor applies whether the obligation results from a tort, a breach of contract, or other obligation." (Rest.2d Judg., § 49, com. a.)

12

As the Supreme Court explained in *DKN*, the rule used to be different. "At common law, when multiple parties promised the same performance, they were presumed to be jointly obligated absent a clear indication otherwise. [Citation.] Parties who are jointly liable are each responsible for their share of a total obligation. When enforcement was sought, the common law rule required that *all* jointly liable parties be joined in a single suit that would determine the total amount of their shared liability." (*DKN*, *supra*, 61 Cal.4th at p. 820.) However, the old compulsory joinder rule had unwanted results, most notably that some plaintiffs couldn't obtain relief because they couldn't reach all the jointly liable parties. (*Ibid.*) "California and nearly all other states have passed statutes to ameliorate the harshness of the common law's compulsory joinder rule. [Citation.] The typical solution was to convert 'joint' obligations into 'joint and several' obligations." (*Ibid.*)

As the Restatement explains, the older rules under which "rendition of judgment against one of several obligors sometimes had the effect of extinguishing a claim against another . . . [were] based on the notion that a 'joint' obligation could be enforced only through a single action, and so an action against one of the obligors was deemed to result in merger of the claim in the judgment. Other rules having like effect were expressed in terms of requiring an 'election of remedies.' Both types of rules were often justified as a means of preventing double recovery for the loss involved. These rules are now obsolete. Double recovery is foreclosed by the rule that only one satisfaction may be obtained for a loss that is the subject of two or more judgments. [Citation.] Requiring that a single action be brought or that the injured party make an election of remedies also formerly had justification insofar as it precluded relitigation of matters previously adjudicated, particularly the issue of the

13

amount of damages sustained. This objective is now accomplished by the modern rule that a claimant may not relitigate issues determined adversely to him in a prior action against another adversary, including issues relating to the damage he has sustained." (Rest.2d Judg., § 49, com. a.) California has adopted these modern rules against double recovery and relitigation of issues decided adversely against a party. (E.g., *Milicevich v. Sacramento Medical Center* (1984) 155 Cal.App.3d 997, 1001-1003; *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 828.)

Thus, the general rule is a plaintiff may sue parties separately, whether they are independently liable or jointly and severally liable. Under the doctrine of res judicata, however, a final judgment on the merits in a prior litigation may "prevent[] relitigation of the same cause of action in a second suit between the same parties or parties in privity with them." (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896.) Thus, a defendant not party to a prior lawsuit may bar subsequent litigation of a claim already decided in the prior case against another defendant. Such preclusion is appropriate only where the two defendants are in "privity."

The Supreme Court articulated the basic test for privity in *DKN*. "As applied to questions of preclusion, privity requires the sharing of 'an identity or community of interest,' with 'adequate representation' of that interest in the first suit, and circumstances such that the nonparty 'should reasonably have expected to be bound' by the first suit. [Citation.] A nonparty alleged to be in privity must have an interest so similar to the party's interest that the party acted as the nonparty's ""virtual representative"" in the first action."

14

(*DKN*, *supra*, 61 Cal.4th at p. 826.) We conclude FlexCare and Eisenhower don't stand in that kind of relationship.

For starters, the Supreme Court held in *DKN* the fact that two parties are joint and several obligors is not enough to put them in privity for purposes of issue or claim preclusion. (*DKN*, *supra*, 61 Cal.4th at p. 826.) That is so because "[t]he liability of each joint and several obligor is separate and independent, not vicarious or derivative." (*Ibid.*) This holding is binding on us.

The recent decision in *Serrano v. Aerotek, Inc.* (2018) 21 Cal.App.5th 773 (*Serrano*) explains why this is the proper holding and why it should control this case. In *Serrano*, Aerotek was a staffing agency and placed temporary employees, like Serrano, with clients, like Bay Bread. Aerotek had in place an employee handbook, which set out, among other things, the agency's meal break policy for the temporary employees it placed with Bay Bread and other employers. Bay Bread had its own meal break policy for its own employees, which differed. In practice, Bay Bread required Aerotek employees to follow Bay Bread's policy, with the result that the plaintiff and others did not receive meal breaks consistent with California employment law. Serrano filed a class action lawsuit against Aerotek and Bay Bread alleging meal break violations. (*Id.* at p. 778.) The trial court granted summary judgment in Aerotek's favor based on the undisputed evidence it "provided Serrano with compliant meal periods, based on evidence that it 'adopted a lawful meal period policy'" which Serrano had received and Serrano's statement that she was "unaware of any actions taken by Aerotek to prevent her from taking meal periods." (*Id.* at p. 780.) The undisputed evidence also showed Aerotek's contract with Bay Bread required the client company to

15

comply with applicable laws and Aerotek trained its temporary employees on meal breaks and required them to notify it if they were being prevented from taking meal breaks. The court concluded nothing more is required of staffing agencies when they provide temporary employees to other companies, so it granted summary judgment for Aerotek. (*Id.* at pp. 780-781.)

Serrano argued the trial court erred by granting summary judgment because Aerotek could be vicariously liable for Bay Bread's separate violations. (*Serrano*, *supra*, 21 Cal.App.5th at p. 782.) The Court of Appeal assumed, without deciding, that the two companies were joint employers, but concluded "whether an employer is liable for a coemployer's violations depends on the scope of the employer's own duty under the relevant statutes, not 'principles of agency or joint and several liability.'" (*Id.* at p. 784.) The court therefore concluded Aerotek could be liable only for its own breach of duty, not vicariously based on a joint employer's liability.

*Serrano* teaches that joint employers are not vicariously liable for each other's Labor Code violations, but liable for their own conduct. One result here, as in *Serrano*, is that staffing agencies and their clients are likely to have very different interests in defending against wage and hour claims. One joint employer can escape liability by pursuing a factual defense even though that defense leaves the other joint employer exposed to liability. The difference in incentives precludes finding the companies are adequate representatives for privity purposes. Here, FlexCare could have gone to trial in the Santa Barbara case defending itself on the theory that Eisenhower committed the wage and hour violations, while it had fulfilled its own duties to its employees. Eisenhower could not be bound by

16

such a finding under the doctrine of issue preclusion precisely because the two companies' legal interests diverged. In other words, FlexCare and Eisenhower were not closely enough aligned to be in privity. (*DKN*, *supra*, 61 Cal.4th at p. 826.)

The fact that the staffing agreement requires FlexCare to indemnify Eisenhower under some circumstances does not change the analysis. Those provisions of the staffing agreement put FlexCare and Eisenhower at legal odds with each other as much as they bring them together. Eisenhower has telegraphed its intent to argue in this case that FlexCare must indemnify it against any liability based on a finding that the two parties were joint employers. FlexCare's incentive is to establish Eisenhower is liable under a theory that doesn't implicate the indemnity clause. Ultimately, FlexCare may fail to do so, but it is clear the two companies have disparate legal interests in the case and cannot act as each other's virtual representatives.

Res judicata may bar a claim brought against an indemnitee where the same claim has already been pursued against the indemnitor. However, that rule applies only "when the indemnitor is, in the first action, acting *in its capacity as indemnitor*. If the indemnitor is sued for its own actions and is not sued as an indemnitor for the acts of another, the rationale favoring preclusion no longer holds." (*F.T.C. v. Garvey* (9th Cir. 2004) 383 F.3d 891, 898.) Here Grande sued FlexCare based on labor law violations FlexCare committed on its own. She didn't allege it was derivatively or vicariously liable as Eisenhower's indemnitor.

FlexCare and Eisenhower argue we should find them in privity with each other because their status as joint employers means they are agents of each other. They rely for this position on *Garcia v. Pexco* (2017) 11 Cal.App.5th 782, 788 (*Garcia*), but the case is

inapposite. *Garcia* involved an attempt by a nonparty to enforce an arbitration clause in an employment agreement. The Court of Appeal recognized an exception to the general rule against allowing such nonparty enforcement "when a plaintiff *alleges* a defendant acted as an agent of a party to an arbitration agreement." (*Ibid.*, italics added.) In *Garcia*, the plaintiff affirmatively alleged the party and the nonparty were "acting as agents of one another." (*Ibid.*) Here, Grande's pleadings don't allege the companies stand in an agency relationship. Moreover, because we are reviewing a judgment after a bench trial rather than interpreting an arbitration agreement, we're not concerned with the pleadings, but the actual relationship of the two companies. (*Durante v. County of Santa Clara*, *supra*, 29 Cal.App.5th at p. 842.) Thus, the limited holding of *Garcia* has no bearing on the issue presented in this case.

As to the actual relationship of the companies, the trial court found, in the context of interpreting the settlement agreement, that neither FlexCare nor Eisenhower was an agent of the other. As the court noted, "'"[W]hether an agency relationship has been created or exists is determined by the relation of the parties as they in fact exist by agreement or acts [citation], and the primary right of control is particularly persuasive."'" (Statement of Decision, p. 17, quoting *Jackson v. AEG Live, LLC* (2015) 233 Cal.App.4th 1156, 1184.) Here, FlexCare and Eisenhower affirmatively disavowed any agency relationship in their contract, which says FlexCare "is performing the services and duties hereunder as an independent contractor and not as an employee, agent, partner of or joint venture with Hospital." The contract notes specifically "[Eisenhower] retains professional and administrative responsibility for the services rendered." Moreover, as the trial court noted, there was no evidence Eisenhower ever acted as FlexCare's agent or vice versa. On the

18

contrary, Eisenhower maintained control over the temporary nurses in the performance of their jobs. It assessed their competency during an orientation program, could require nurses to take its medication and clinical skills test, and retained discretion to make decisions about the nurses' assignments and to terminate nurses for poor performance. In addition, the staffing agreement made clear nurses were required to conform with hospital's policies and procedures. These facts show FlexCare and Eisenhower operated independently, and constitute substantial evidence supporting the trial court's finding that neither company was an agent of the other.

Finally, FlexCare and Eisenhower argue we should follow the recent decision of *Castillo v. Glenair, Inc.* (2018) 23 Cal.App.5th 262 (*Castillo*). There, the Second District, Division Two held a class of workers cannot "bring a lawsuit against a staffing company, settle that lawsuit, and then bring identical claims against the company where they had been placed to work." (*Id.* at p. 266.) The Second District concluded the staffing agency and the client were in privity with each other for purposes of the wage and hour claims. (*Ibid.*)

We are not bound by the decision of the Second District. (*The MEGA Life & Health Ins. Co. v. Superior Court* (2009) 172 Cal.App.4th 1522, 1529; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 498, pp. 558-559.) However, because stare decisis serves the important interests of stability in the law and predictability of decisions, we ordinarily follow the decisions of other districts, unless we have good reason to disagree. (*Ibid.*) In this case, departure from *Castillo* is justified because the court failed to apply the test for privity articulated in *DKN*. As a result, its conclusion that the staffing agency and its client were in privity is not supported.

19

What courts are required to ask in determining whether a party and nonparty are in privity is whether they shared "'an identity or community of interest,' with 'adequate representation' of that interest in the first suit," under circumstances where the nonparty "'should reasonably have expected to be bound' by the first suit." (*DKN*, *supra*, 61 Cal.4th at p. 826.) The *Castillo* court didn't ask that question. Instead, following *Cal Sierra Development, Inc. v. George Reed, Inc.* (2017) 14 Cal.App.5th 663, the court asked whether the "subject matter of the litigation . . . was the same as that at the center of the [prior] dispute" and whether the party and the nonparty "shared the same relationship to the subject matter."[2] (*Castillo*, *supra*, 23 Cal.App.5th at p. 279.) Employing that standard, the court concluded the two companies were in privity because "[t]he subject matter of this litigation is the same as the subject matter of the [prior, settled] *Gomez* litigation—namely, both cases involve the same wage and hour causes of action arising from the same work performed by the same [staffing agency] employees (the Castillos) at [the staffing agency's] client company" (*id*. at pp. 279-280) and both the client and the staffing agency "were involved in and responsible for payment of the Castillos' wages." (*Id.* at p. 280.)

---

[2] The test *Castillo* applies traces to an aside in a South Carolina Supreme Court case. (See *Cal Sierra Development, Inc. v. George Reed, Inc.*, *supra*, 14 Cal.App.5th at p. 674, citing *Manning v. South Carolina Dept. of Highway and Public Transportation* (4th Cir. 1990) 914 F.2d 44, 48.) But the test isn't properly a test for privity even in South Carolina. That state's Supreme Court wrote, "The term 'privy,' when applied to a judgment or decree, means one so identified in interest with another that he represents the same legal right. One in privity is one whose legal interests were litigated in the former proceeding." (*Richburg v. Baughman* (S.C. 1986) 351 S.E.2d 164, 166.) The language certain courts have plucked from *Richburg* emphasized that privity "does not embrace relationships between persons or entities, but rather it deals with a person's relationship to the subject matter of the litigation" only in response to the litigants' argument that a parent and child were in privity with each other just by virtue of their relationship to each other. (*Ibid.*)

20

Respectfully, this is not the correct analysis. The first step in deciding whether res judicata (claim preclusion) applies is to determine whether the prior and current lawsuits involve the same causes of action. (*Mycogen Corp. v. Monsanto Co.*, *supra*, 28 Cal.4th at p. 896.) It's only after we answer that question affirmatively, that we get to the question of the parties' relationship to the claim. If the person or entity seeking preclusive effect was not a party to the first litigation, we must then focus on their relationship to the party and the subject matter of the litigation, asking whether their interests are *so close to identical* that the nonparty should have reasonably expected to be bound by the prior judgment even though not a party. By focusing overmuch on whether the subject matter of the litigation is the same, the *Castillo* court nearly collapses the second element (same parties) into the first (same claims). The court then justified finding a sufficiently close relationship on the fact that both companies were involved in paying the plaintiffs their wages. That's simply not a sufficient basis for finding a client and staffing agency to be in privity. As the court explained in *Serrano*, a staffing agency and a client may both be "involved in" the payment of wages, yet be independently liable for wage and hour violations. We therefore depart from the reasoning in *Castillo*, conclude FlexCare and Eisenhower were not in privity, and affirm the trial court.

B.  *Eisenhower is Not a Released Party under the Settlement Agreement*

Eisenhower and FlexCare also argue the trial court erred by determining Eisenhower was not a released party under the settlement agreement.

Settlement agreements incorporated into a judgment are construed under the rules governing the interpretations of contracts generally. (*In re Marriage of Iberti* (1997) 55

21

Cal.App.4th 1434, 1439.) "The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting. [Citations.] When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible." (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955.) "When no extrinsic evidence is introduced, or when the competent extrinsic evidence is not in conflict, the appellate court independently construes the contract. [Citations.] When the competent extrinsic evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction [following a trial] will be upheld if it is supported by substantial evidence." (*Iqbal v. Ziadeh* (2017) 10 Cal.App.5th 1, 8 (*Iqbal*).)

Under these familiar standards, the question we must decide is whether the language of the release shows the parties intended to release Eisenhower and other hospital clients of FlexCare. The settlement release clause says the "Class Members release the Released Parties from the Released Claims. Class Members agree not to sue or otherwise make a claim against any of the Released Parties that is in any way related to the Released Claims." If the settlement defined "Released Party" by naming Eisenhower, as it named FlexCare and several other individual parties, we would have to conclude Grande had settled her claims against the hospital. But the definition of "Released Parties" doesn't do that. It names "FlexCare, LLC, Vantus, LLC, Christopher Truxal, Travis Mannon, Michael Kenji Fields, and Nathan Porter" as the parties subject to the release.

The settlement includes a long list of categories of people and entities who also fall within the definition of "Released Parties" based on their relationship to the named parties.

22

Also released are "all present and former subsidiaries, affiliates, divisions, related or affiliated companies, parent companies, franchisors, franchisees, shareholders, and attorneys, and their respective successors and predecessors in interest, all of their respective officers, directors, employees, administrators, fiduciaries, trustees and agents, and each of their past, present and future officers, directors, shareholders, employees, agents, principals, heirs, representatives, accountants, auditors, consultants, insurers and reinsurers, and their counsel of record." Despite the broad language, none of the categories appears broad enough to encompass FlexCare's clients as a group.

The list does not include words such as clients, joint employers, joint obligors, or other similar language which could reasonably be read to include the hospitals to which the plaintiff class members had been assigned. As Grande points out, if FlexCare and the class representatives had intended to release Eisenhower, they could have included as a Released Party, "any client of FlexCare as to whom any class member may have provided services through FlexCare." The fact that they did not do so weighs in favor of finding Eisenhower was not released. (*Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 527 ["The failure of the Release to specifically name Ford even though the signatories to the Release had counsel and were aware of [plaintiff's] claims against Ford also suggests that the Release did not cover those claims"].)

FlexCare and Eisenhower argue the definition of Released Parties does include Eisenhower—and presumably the other hospital clients—because it releases FlexCare's "related or affiliated companies." They argue Eisenhower was a related or affiliated company because they were "connected" in some way, namely in that FlexCare provided

23

temporary nursing staff to Eisenhower under a contract. Under settled principles of contractual interpretation, Eisenhower would be protected against liability under the release only if Grande and FlexCare intended to cover Eisenhower as one of the parties' affiliates. (*Iqbal*, *supra*, 10 Cal.App.5th at p. 9.)

Where words have a definite legal meaning, we presume the parties intended them to have their ordinary legal meaning, unless a contrary intent appears in the instrument. (*Weinreich Estate Co. v. A.J. Johnston Co.* (1915) 28 Cal.App. 144, 146 ["legal terms are to be given their legal meaning unless obviously used in a different sense"].) The term "affiliate company" is known to mean a "[c]ompany effectively controlled by another company. A branch, division, or subsidiary." (Black's Law Dictionary (6th ed. 1990) p. 58.) Other sources confirm the same meaning for the term "affiliate." (See *Iqbal*, *supra*, 10 Cal.App.5th at p. 9 [collecting sources which "indicate the common meaning of an affiliate generally is one who is dependent upon, subordinate to, an agent of, or part of a larger or more established organization or group"].) We conclude the terms "affiliate" and "affiliated company" are unambiguous and "refer[] to a relationship that is closer than a mere arm's length contractual relationship." (*Ibid.*; see also *Satterfield v. Simon & Schuster, Inc.* (9th Cir. 2009) 569 F.3d 946, 955 ["The plain and ordinary meaning of 'affiliate' supports this definition as 'a company effectively controlled by another or associated with others under common ownership or control'"].)

There is no indication in the settlement agreement or otherwise that the parties had some other meaning in mind. It is plain from the staffing agreement, the stipulation, and other extrinsic evidence that the two companies are not related or affiliated in this sense.

24

Indeed, the parties stipulated specifically that Eisenhower was not a division, subsidiary, parent, franchisor, franchisee, or shareholder of the named released parties. Under the uncontested facts of the case, then, Eisenhower and FlexCare are not affiliated companies as a matter of law.

Nor can the inclusion of the term "related," in the category "related or affiliated company" expand the meaning of the phrase to include the relationship FlexCare and Eisenhower did have—a contractual relationship for the supply of temporary workers. "Related company" means essentially the same thing as "affiliated company." (Cambridge Business English Dictionary [defining "related company" as "a company that controls or is controlled by another company, often one that is in the same business group"].)

FlexCare and Eisenhower also argue Eisenhower was a released party because it was a principal or agent of FlexCare. They base their argument largely on the assertion that the trial court assumed they were joint employers and the court in *Garcia*, *supra*, 11 Cal.App.5th at p. 788, held joint employers are necessarily agents of each other. As we discussed above, this argument is not persuasive. *Garcia* does not stand for the proposition that joint employers are agents of each other as a matter of law.

It's important to read all these terms in the context of the entire list of released parties. Courts should adopt a restrictive meaning of a listed item if acceptance of a broader meaning would make the item markedly dissimilar to the other items in the list. (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 307.) A corollary holds "'"[w]here general words follow the enumeration of particular kinds or classes of persons or things, the general words will, unless a contrary intent is manifested, be construed as applicable only to

25

persons or things of the same general nature or class as those specifically enumerated.""" (*Huverserian v. Catalina Scuba Luv, Inc.* (2010) 184 Cal.App.4th 1462, 1468-1469.) Here, the release begins by listing specific entities and persons. Besides FlexCare, it specifically releases the company's corporate parent as well as partners and officers of the company. The general terms that follow—subsidiaries, divisions, parent companies, shareholders, attorneys, officers, directors, employees, administrators, fiduciaries, and trustees—identify categories of persons or entities who, like the specifically named parties, either exercise control over FlexCare or act on their behalf. Thus, construing the terms "affiliate," "related or affiliated companies," and "agents" more broadly than their standard legal sense is inconsistent with the definition of Released Party as a whole.

The trial evidence also weighs against concluding the parties were in a principal-agent relationship. "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." (Rest.3d Agency, § 1.01.) The trial court concluded there was no evidence Eisenhower ever acted as FlexCare's agent or vice versa. Eisenhower maintained control over the temporary nurses in the performance of their jobs. It assessed their competency during an orientation program, retained discretion to require nurses to take its medication and clinical skills test, and had authority under the contract to make decisions about the nurses' assignments, including whether to terminate them for poor performance. In addition, the staffing agreement made clear nurses were required to conform with the hospital's policies and procedures and use the hospital's time and attendance system. In

26

addition, the travel nurse agreement required Grande to report her hours worked to FlexCare after obtaining approval from Eisenhower. Finally, FlexCare's corporate representative testified FlexCare did not control Eisenhower and said he didn't know whether Eisenhower exercised control over FlexCare. These facts support the trial court's finding that FlexCare and Eisenhower did not exercise control over each other, and provide sufficient support for the trial court's finding that neither company was an agent of the other.[3] (*Iqbal*, *supra*, 10 Cal.App.5th at p. 8.)

We're left with the fact that the staffing agreement between FlexCare and Eisenhower disavows any agency relationship between them. "[FlexCare] is performing the services and duties hereunder as an independent contractor and not as an employee, agent, partner of or joint venture with Hospital. Hospital retains professional and administrative responsibility for the services rendered." That provision, while not dispositive of the relationship, is the best evidence we have regarding whether the parties understood the companies to be in a principal-agent relationship, and strongly counsels against overruling the trial court and reading into the agreement a release of Eisenhower.

For all these reasons, we affirm the trial court's determination that Eisenhower is not a released party under the terms of the settlement agreement and allow the Riverside putative class action to proceed in the trial court.

---

[3] Though a representative of FlexCare did testify he understood the settlement to release Eisenhower, there's no evidence he expressed this intention to anyone, and undisclosed, subjective intent is irrelevant to interpreting the release's language objectively. (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, *supra*, 109 Cal.App.4th at p. 955.)

27

# III

## DISPOSITION

We affirm the trial court's judgment against FlexCare and deny Eisenhower's petition for a writ of mandate. Our previous stay order will be dissolved when this opinion becomes final. Eisenhower and FlexCare shall bear Grande's costs.

CERTIFIED FOR PUBLICATION

SLOUGH _____

J.

I concur:

RAPHAEL _____

J.

28

[*Grande v. Eisenhower Medical Center*, E068730]

Ramirez, P.J., Dissenting

Recently, *Castillo v. Glenair, Inc.* (2018) 23 Cal.App.5th 262 held — on facts essentially identical to those here — that a settlement agreement between a staffing company and its employees barred those employees from asserting the same claims against the staffing company's client.  Specifically, it held that the client was the staffing company's agent, and therefore within the scope of the release that the employees had given.  (*Id.* at pp. 281-282, 285-286.)  It also held, alternatively, that the staffing company and the client were in privity for purposes of res judicata.  (*Id.* at pp. 278-282, 286-287.)

The majority deems *Castillo* to be irreconcilable with *DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813.  (Maj. opn. at pp. 12-15, 17, 19-20.)  *Castillo* itself, however, considered this very argument (and reconsidered it on rehearing), but rejected it.  (*Castillo v. Glenair, Inc.*, *supra*, 23 Cal.App.5th at pp. 280, 287.)  Likewise, the majority relies on *Serrano v. Aerotek, Inc.* (2018) 21 Cal.App.5th 773.  (Maj. opn. at pp. 15-16, 21.)  *Castillo*, however, concluded that "*Serrano* is procedurally, factually and legally distinct . . . ." (*Castillo v. Glenair, Inc.*, *supra*, at p. 286; see also *id*. at pp. 285-286.)

I would follow *Castillo*, as a matter of stare decisis.  *Castillo* at least has the virtue of stating clear rules on which parties on all sides can easily rely going forward.  I do not find *Castillo* to be so plainly wrong as to justify creating a split of authority in this area.

RAMIREZ
P. J.

1