Filed 1/27/22  Valentine v. Concert Global CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JOHN VALENTINE, et al., <br><br> Cross-Defendants and Appellants, <br><br> v. <br><br> CONCERT GLOBAL INC., et al., <br><br> Cross-Complainants, and Respondents. | H043237 <br> (Santa Clara County <br> Super. Ct. No. 2012-1-CV-219304) |

A jury found that appellants John Valentine (Valentine), and Valentine Capital Asset Management, Inc. and Valentine Wealth Management, Inc. (VCAM) made false statements, without reasonable care, and intentionally interfered with the prospective economic relations of respondents Corey Casilio (Casilio) and William Leitch (Leitch), their business Casilio Leitch Investments (CLI), and the companies that served as Casilio, Leitch, and CLI's Security and Exchange Commission (SEC) registered investment advisory firm, Concert Global, Inc. and Concert Wealth Management (Concert).  The jury awarded compensatory and punitive damages based on actions taken by Valentine and VCAM after Casilio and Leitch left their employment with VCAM.

On appeal, Valentine contends the trial court erred by failing to apply the doctrines of issue preclusion and/or claim preclusion to limit the amount of damages awarded to CLI and Concert based on conduct that was the subject of a prior related arbitration. Valentine further argues the judgment includes duplicative damages, such that it must be

modified to preclude double recovery.  Finally, Valentine argues the trial court erred by allowing the jury to hear repeated references to the prior arbitration, while not allowing the admission of any rebuttal evidence.

We conclude that CLI and Concert were in privity with Casilio and Leitch, and are precluded from recovering damages based on conduct that was adjudicated during the prior arbitration.  The trial court erred when it failed to instruct the jury that the award of damages to CLI and Concert could be based only on conduct Valentine and VCAM engaged in or harm incurred after the date of the arbitration.  Further, there is not substantial evidence to support an inference that the jury relied solely on post-arbitration conduct when it awarded damages to CLI and Concert.  We will reverse the judgment and remand the matter to the trial court for a retrial to determine appropriate damages.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[1]

Valentine is the sole owner and president of VCAM.[2]  Casilio and Leitch worked for VCAM for several years.  In September 2011, Casilio and Leitch left their employment and formed CLI as a limited liability company, which entered into an agreement with Concert, under which Concert would serve as Casilio, Leitch, and CLI's SEC registered investment advisory firm.[3]

Casilio and Leitch thereafter informed their VCAM clients that they had left the company.  Beginning in September 2012, several of these VCAM clients filed complaints

[1] We have carefully reviewed the record in its entirety; we include only those portions of the arbitration and trial court proceedings, and evidence elicited therein, relevant to the issues raised on appeal.

[2] Valentine stipulated that Valentine Wealth Management would be jointly and severally liable for any judgment on the cross-complaint against Valentine Capital Asset Management, Inc.  Although Valentine and VCAM jointly noticed this appeal, only Valentine filed an appellant's opening brief, in which he indicates that VCAM is "not actively participating [in] this appeal."

[3] For sake of clarity, we refer to Valentine and VCAM collectively as Appellants, and to Casilio, Leitch, CLI and Concert collectively as Respondents.  Individual parties and entities are referenced separately where appropriate.

against Purshe Kaplan Sterling Investments, Inc. and Casilio and Leitch with the Financial Industry Regulatory Agency (FINRA), including allegations that Casilio and Leitch stole confidential client information from VCAM.[4]  In response, Casilio and Leitch filed a third-party claim against Valentine as part of the FINRA proceeding, asserting causes of action for indemnity, violation of SEC and FINRA rules and regulations, libel per se, constructive discharge, and breach of contract and the implied covenant of good faith and fair dealing.

The FINRA claims were subject to arbitration.  "Before engaging in activities as a registered representative for a FINRA-member firm, all registered representatives of broker-dealers, investment advisors, and securities issuers must sign a 'Uniform Application for Securities Industry Registration or Transfer,' commonly referred to as Form U-4. [Citation.]  The Form U-4 is a contract between the regulatory organization (here FINRA) and the individual registrant. [Citation.]" (*Valentine Capital Asset Management, Inc. v. Agahi* (2009) 174 Cal.App.4th 606, 613.)  Form U-4 includes an arbitration provision requiring arbitration of any dispute arising between the individual registrant and their firm or customers.  (*Ibid*.)  The VCAM clients dismissed their claims against Casilio and Leitch in April 2014, leaving only the third-party claim Casilio and Leitch brought against Valentine to be arbitrated.[5]

Prior to the commencement of the arbitration, VCAM filed a civil complaint against Respondents, alleging causes of action for violation of the Uniform Trade Secrets Act, unfair business practices under several statutes, intentional interference with

---

[4] Purshe Kaplan was a Fidelity Investment company that provided a brokerage platform and services for investment advisors.

[5] The arbitration panel also granted Purshe Kaplan's motion to dismiss "on the grounds that Respondent Purshe Kaplan was not associated with the accounts, securities or conduct at issue. . . .  The responsible party who had control over Claimants' accounts is named as Third Party Respondent John Leo Valentine operating under various Valentine business entities."

3

contractual relations, negligent and intentional interference with prospective economic advantage, conspiracy, breach of contract, conversion, imposition of a constructive trust, trade libel, violation of Penal Code section 502, subdivision (c), breach of employee's duty of loyalty, and breach of fiduciary duty. Valentine was not a named plaintiff in the action. Respondents in return filed a cross-complaint against VCAM and Valentine, stating causes of action for libel per se, slander per se, intentional interference with prospective economic advantage, intentional interference with contractual relations, and unfair, unlawful, and fraudulent business practices.[6]

## A. Arbitration proceedings

A three-person arbitration panel heard the FINRA claims over ten days of hearings. In a decision and award issued June 3, 2014, the panel made the following findings: "The evidence and testimony presented at the hearing showed that, after [Casilio and Leitch's] departure from Valentine Capital Asset Management, Inc., Third Party Respondent Valentine: (1) instigated, induced, and assisted Claimants, and other customers, to write complaint letters against Mr. Casilio and Mr. Leitch to Purshe Kaplan Sterling Investments, Inc. to damage and malign their BrokerCheck records (it is particularly noteworthy that Mr. Leitch had no direct contact with any of the Claimants and did not handle any of their accounts at Valentine Capital Asset Management, Inc.; therefore, he was personally unknown to these Claimants); (2) encouraged Claimants and customers to file FINRA arbitration claims for the purpose of extracting settlement monies from the broker dealer and/or insurance money to cover their losses and divert attention away from Third Party Respondent Valentine's own management directives; (3) collaborated with Claimants' counsel to plant, publish, and disseminate derogatory and sensational news stories charging Mr. Casilio and Mr. Leitch with fraud and elder abuse and to encourage other investors to join in; (4) manufactured evidence against

---

[6] The cross-complaint was amended. The operative pleading is the third amended cross-complaint.

Mr. Casilio and Mr. Leitch after their departure from Valentine Capital Asset Management, Inc. and furnished it to Claimants' counsel and to customers of the firm; and (5) induced or coerced Webmastering Firm goldfishconsulting.com, headed by Jad & Amy Duncan who are the lead Claimants in this case, to disparage Mr. Casilio and Mr. Leitch with defamatory accusations and altered biographies on google searches so that customers and prospects would be deterred from doing business with them. Specifically, Third Party Respondent Valentine, or someone under his direction, sent periodic mass mailings which libeled Mr. Casilio and Mr. Leitch to customers and prospects; and email [*sic*] correspondence indicated that Third Party Respondent Valentine mailed Mr. Casilio's amended negative Form U5 to customers after Third Party Respondent Valentine pledged to refrain from this infraction in a letter dated July 30, 2009[,] to a FINRA investigator.  Moreover, corroborative testimony and evidence showed that Third Party Respondent Valentine directed all his financial advisors to transfer sensitive client data, which included social security numbers, by their personal unsecured e-mail accounts to evade the oversight of Respondent Purshe Kaplan in the summer of 2011.  The transfer to another custodian was necessitated by Fidelity's notice in the spring of 2011 that they would be terminating their business dealings as custodian of Valentine Capital Asset Management, Inc.'s accounts."

Although Valentine argued that his actions were justified by a contractual agreement with Casilio and Leitch which precluded them from soliciting VCAM customers for a year after leaving the firm, the arbitration panel found no credible evidence to support this assertion, and concluded that Casilio and Leitch had done nothing more than notify customers of their change of registered investment advisor firms.

Based on these findings, the panel ordered Valentine to pay Casilio and Leitch $800,000 in compensatory damages, $2.5 million in punitive damages, and $338,081 in attorneys' fees, as well as some previously ordered sanctions and fees Valentine had not

yet paid, finding Valentine to be "solely liable" for these amounts. The panel also recommended that all references to the arbitration, and all customer complaints addressed in the arbitration, be expunged from Casilio and Leitch's "CRD" registration records, once the award was confirmed by a court of competent jurisdiction.[7] The San Diego County Superior Court granted Casilio and Leitch's motion to confirm the arbitration award, and entered judgment in their favor against Valentine in the amount of $3,668,737, plus interest.

### B. Trial Proceedings

As the FINRA arbitration advanced, the parties proceeded with the civil action underlying this appeal. After the FINRA arbitration panel returned its findings and award, a portion of the civil action was heard in a jury trial in August and September 2015, and the trial court subsequently conducted a bench trial on the causes of action for unfair business practices and constructive trust.

#### 1. Motions in Limine

Prior to trial, Respondents requested an order 1) precluding Valentine from introducing evidence at trial related to the issues of Respondents' alleged misappropriation of trade secrets, unlawful solicitation and trade libel, on the grounds those issues had already been litigated in the FINRA arbitration, and 2) entering all findings contained in the FINRA arbitration award as conclusive facts in the civil action. Opposing this motion, Appellants argued that 1) the parties to the arbitration proceeding

---

[7] Under FINRA's rules and regulations, customer complaints are documented in "FINRA's Central Registration Depository (CRD), an electronic database containing ' "information reported in connection with the registration or licensing of brokers and dealers and their associated persons, including disciplinary actions, regulatory, judicial, and arbitration proceedings . . . ." (15 U.S.C. § 78o-3(i)(1)(A) & (i)(5).)' [Citation.] Information contained in the CRD is accessible to securities firms and regulators. Certain customer complaints and allegations of misconduct documented in the CRD also are available to the public via FINRA's 'BrokerCheck' website." (*Royal Alliance Associates, Inc. v. Liebhaber* (2016) 2 Cal.App.5th 1092, 1097.)

had not agreed it would have preclusive effect; 2) Valentine did not have a full opportunity to present his evidence at the arbitration hearing; and, 3) VCAM was not a party to the arbitration and did not have a fair opportunity to assert its claims. Appellants did not explicitly deny that privity existed between Valentine and VCAM with regard to the arbitrated claims, but in support of their argument that VCAM should not be bound by the FINRA panel's decision, relied on legal authority suggesting such privity was necessary in order to bind a non-participant party to the arbitration order. At the hearing on the motion in limine, Appellants' counsel conceded that the arbitration award would not preclude Respondents from obtaining recovery against VCAM, as the order only awarded damages against Valentine individually; counsel, however, argued that an additional award against Valentine would constitute double recovery for the same underlying conduct. The trial court denied Respondents' motion.

The trial court also denied VCAM's request for an order, based on the doctrine of claim preclusion, "dismissing [Respondents'] cross complaint and precluding any reference to facts supporting their claims unless they are relevant to other issues in the case."

### 2. *Evidence of Post-Arbitration Conduct*

During the trial Casilio and Leitch testified regarding events that took place before and after the issuance of the FINRA arbitration award. With respect to Valentine's and VCAM's post-arbitration actions, the trial court admitted into evidence an article distributed by VCAM, entitled "Theft Not Reprimanded by FINRA or SEC Part 2: Enforcing Cyber-Theft by Advisors." The article claimed that VCAM had been "the victim of cyber-attack's [*sic*] coming in the form of former employees downloading client information from [VCAM's] databases and using that data illegally." The article further alleged that Casilio and Leitch "fraudulently and deceptively" logged into the VCAM computer system and "stole [VCAM's] client information without approval," claiming Casilio and Leitch stole the information in an attempt to poach clients, and

7

likening their conduct to cyber-theft experienced by "larger companies such as Target, Home Depot and Chase." Stating that "sensitive business information" was copied from a computer, the article noted the username who created the file was " 'ccasilio.' " The article then suggested that "the details of a person's entire retirement savings can be exposed from a cyber-attack," referring to such an attack as "elder abuse."

Casilio testified that the article came from a blog or newsletter written by VCAM and distributed to an e-mail list. Leitch saw the article on VCAM's website. One of Casilio's clients notified him about the article in March 2015; Casilio then went to the blog and saw it on VCAM's archive. The article continued to appear on the blog on August 28, 2015, the day Casilio testified at trial. Based on Casilio's experience working at VCAM, he testified that newsletter articles were sent to all of VCAM's clients, as well as anyone entered into the company's database, "which was thousands of people" who were on the "distribution list," such that potential client investors would have received the article, in addition to current VCAM clients. Casilio confirmed that the article referred to conduct that was alleged by at least one VCAM client in the FINRA complaints that were ultimately expunged in the arbitration award. Casilio understood that VCAM published the article after the panel issued the arbitration award, which Leitch confirmed in his testimony.

Valentine confirmed that he wrote the subject article, which was put on the VCAM website and sent out as a newsletter.

Noting that several clients forwarded the 2015 article to him, Casilio stated that none of his existing clients were particularly concerned about the allegations contained in the materials, as "they have received plenty of other stuff in the past . . . ." However, in the intervening years commencing when Casilio and Leitch left VCAM to the date of the trial, Casilio indicated that they had lost clients and potential business as a result of the e-mails and publications VCAM had put into the public. VCAM's issuance of the materials changed the way they conducted their business, requiring them to take a

8

"proactive approach" and address the damaging information at the outset of meetings. Casilio estimated that damages to the business from the clients and potential opportunities lost prior to the June 2014 arbitration award—when the complaints were expunged from Casilio and Leitch's records—were $1.6 million in revenue over 10 years, which he believed to be a "conservative and fair" projection of how long an average client might stay with CLI. He projected that after the publication of the article in March 2015, the company continued to lose business opportunities because the problems with VCAM persisted, causing the loss of approximately $400,000 in potential business, which reflected the loss of two clients using the same 10-year estimate. Leitch agreed with Casilio's estimates.

In addition to the monetary loss to the business, Casilio discussed the personal impact he suffered as a result of Valentine and VCAM's conduct. Having a client complaint on his FINRA record could affect not only opportunities with other business partnerships, but also his ability to procure a job at another institution. He also claimed there was an emotional impact from the publications, noting it had been difficult for Casilio and Leitch's families to deal with allegations against them. Leitch echoed this testimony, calling the prior four years "the worst experience of my life. . . . It was having a gnawing, unrelenting, brutal uncertainty about the future that the ground could drop out from me at any moment."

Evidence was adduced regarding the relationship between Concert, CLI, Casilio and Leitch. Concert provided the SEC license that was necessary for Casilio and Leitch to operate as financial and investment advisors. In exchange, Concert received 25 percent of the revenue that Casilio and Leitch generated from client accounts. Elizabeth Luna, an owner of Concert, testified that the company would be entitled to damages owed to Casilio and Leitch because it had a share in their revenue. In addition to that loss of revenue, Luna testified that Concert lost advisor prospects—people who might have joined the firm as advisors—because of the litigation; she estimated that the

9

company lost $500,000 per year in annual revenue over the four years the litigation had been pending, for a total of $2 million. The other Concert owner, Felipe Luna, testified that Concert Wealth Management is owned by Concert Global, Inc.; in his mind they are "one and the same company."

Valentine testified that in addition to clients who went with Casilio and Leitch to CLI, 126 clients left VCAM between September 2011 and September 2015, representing $155 million in assets and $1.5 million in yearly revenue to VCAM. Having talked to all 126 clients, Valentine believed these clients left VCAM and declined to invest with CLI because of the issues between Valentine, Casilio, and Leitch, stating, "They just didn't want to deal with [Leitch], didn't want to deal with [Casilio], didn't want to deal with me. And so they found another place to go."

### 3. Verdict

At the close of evidence, the trial court instructed the jury that Casilio and Leitch could not recover damages against Valentine based on any conduct he engaged in, or any harm Casilio and Leitch suffered from him, prior to June 3, 2014, which was the date of the FINRA arbitration award. The significance of the date was not explained to the jury. The instruction explicitly stated that this limitation did not apply to the amount of damages that could be awarded to CLI or Concert, or against VCAM.

The jury returned a verdict on VCAM's complaint finding that Respondents were not liable to VCAM for any of the claims set forth therein.[8] With respect to Respondents' cross-complaint, the jury found that VCAM and Valentine made false statements, without reasonable care, about all Respondents, and intentionally interfered with all Respondents' prospective economic relations. The jury returned a verdict in favor of Respondents, finding that VCAM and Valentine each owed $1 in compensatory

---

[8] Appellants do not challenge the judgment as it pertains to the claims asserted in VCAM's complaint; they only challenge the judgment as to the Respondents' cross-complaint.

10

damages to Casilio, Leitch, and Concert Global, Inc. The jury determined VCAM and Valentine each owed $461,500 in compensatory damages to CLI, and $33,750 to Concert Wealth Management. In addition to compensatory damages, the jury determined Valentine and VCAM each "acted with recklessness, malice, oppression or fraud, such that punitive damages are appropriate"; it found that Valentine and VCAM should pay such damages to Casilio, Leitch, and CLI.

Following the verdict, the court held a separate phase of trial to determine the appropriate amount of punitive damages. The jury determined Valentine and VCAM should each pay $923,000 to CLI.[9]

After the jury returned its verdict on the amount of punitive damages, the trial court held a conference with the parties' attorneys. Appellants' counsel expressed concern that the verdict forms might have confused the jury, which had awarded damages against both Valentine and VCAM: "[T]he issue is the problem could be that they are awarding—they think they are awarding one set of damages because [Valentine] was acting under the scope of VCAM and they are actually awarding two sets of damages. I mean, there could be an ambiguity there." At the attorney's suggestion, the court questioned the jury to confirm its intent. The jury foreperson indicated the jury intended to award damages against both VCAM and Valentine, rather than one "overlapping" amount to be divided between the two, stating, "[W]e were very deliberate about it." Each of the individual jurors confirmed to the court that they agreed with the foreperson's explanation.

The trial court entered judgment based on the jury's verdicts.[10] Shortly thereafter, Appellants filed motions for a new trial and judgment notwithstanding the verdict. In the

_____

[9] Casilio and Leitch withdrew their requests for punitive damages prior to the start of the second phase of trial.

[10] In its separate bench trial, the trial court denied VCAM's claims for unfair business practice and for imposition of a collective trust, as well as Respondents' claims

11

motion for judgment notwithstanding the verdict, Appellants argued that CLI should not have been allowed to recover more in damages than was awarded against Casilio and Leitch, as they believed any additional amount compensated CLI for damages already awarded against Valentine in the FINRA arbitration. Similarly, as one of the bases set forth for seeking a new trial, Appellants argued, in part, that the jury awarded excessive damages to CLI for damages already awarded against Valentine in the FINRA arbitration. The trial court denied both of Appellants' post-trial motions. Appellants filed a timely notice of appeal.

## II. DISCUSSION

### A. Claim Preclusion Bars Recovery for Damages Related to Pre-Arbitration Conduct

Valentine first contends the trial court erred when it entered the post-verdict judgment against Valentine and VCAM and in favor of CLI and Concert based on conduct that was litigated by Valentine, Casilio, and Leitch in the FINRA arbitration. He asserts CLI and Concert are in privity with Casilio and Leitch, such that CLI and Concert's claims were barred under the doctrines of claim and/or issue preclusion. Valentine argues that, "Settled principles of claim and issue preclusion bar a second judgment by privies on the same claims and issues that were resolved by related parties in arbitrations." In his reply brief, Valentine states in clarification that "the same conduct by John Valentine was litigated and remedied in both the FINRA arbitration and this action," alleging that "other than the March 2015 article in VCAM's newsletter . . . both proceedings addressed the same conduct . . . and any harm to CLI or [Concert] was derived from the harm to Casilio and Leitch that was remedied by the judgment confirming the FINRA award." (Italics omitted.) Valentine further contends that an " ' "[i]dentity of claims exists [as the actions arose] from the same transactional nucleus

for injunctive relief. The trial court included these rulings in its judgment; Appellants do not challenge those rulings on appeal.

12

of facts." ' " Respondents argue that the civil trial involved different claims and different parties than the FINRA arbitration and that res judicata therefore does not limit damages to Valentine and VCAM's post-arbitration actions.

The California Supreme Court has adopted the use of "the terms 'claim preclusion' to describe the primary aspect of the res judicata doctrine and 'issue preclusion' to encompass the notion of collateral estoppel. [Citation] It is important to distinguish these two types of preclusion because they have different requirements. [¶] *Claim preclusion* 'prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them.' [Citation.] Claim preclusion arises if a second suit involves (1) the same cause of action (2) between the same parties (3) after a final judgment on the merits in the first suit. [Citations.] If claim preclusion is established, it operates to bar relitigation of the claim altogether." (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 824 (*DKN Holdings*).)

"*Issue preclusion* prohibits the relitigation of issues argued and decided in a previous case, even if the second suit raises different causes of action. [Citation.] . . . [¶] . . . [I]ssue preclusion applies: (1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party. [Citations.]" (*DKN Holdings*, *supra*, 61 Cal.4th at pp. 824-825.) It differs from claim preclusion in two ways. "First, issue preclusion does not bar entire causes of action. Instead, it prevents relitigation of previously decided issues. Second, unlike claim preclusion, issue preclusion can be raised by one who was not a party or privy in the first suit. [Citation.]" (*Ibid.*)

### 1. Privity

We first examine whether CLI and Concert were in privity with Casilio and Leitch, such that CLI and Concert would be barred from recovering damages based on the claims and issues that were resolved in the FINRA arbitration. " 'As applied to

13

questions of preclusion, privity requires the sharing of "an identity or community of interest," with "adequate representation" of that interest in the first suit, and circumstances such that the nonparty "should reasonably have expected to be bound" by the first suit. [Citation.] A nonparty alleged to be in privity must have an interest so similar to the party's interest that the party acted as the nonparty's " ' "virtual representative" ' " in the first action. [Citation.]' [Citation.]" (*Cal Sierra Development, Inc. v. George Reed, Inc.* (2017) 14 Cal.App.5th 663, 673 (*Cal Sierra*).) The nonparty must have had adequate representation in the first action, and " ' "should reasonably have expected to be bound by the prior adjudication." ' [Citation.]" (*Ibid.*) We review the trial court's determination regarding privity de novo, as it is a legal question. (*Ibid.*)

We determine that Casilio and Leitch were privies with both CLI and Concert. Casilio and Leitch had similar interests to CLI and Concert in the arbitration proceedings. Casilio and Leitch formed CLI as a limited liability company to facilitate their financial and investment advisor business when they left VCAM, and thus shared an obvious identity of interest, if not identity, with their own business enterprise. The success of CLI was contingent on the successful enrollment of clients by CLI's two founders. Concert also shared the same interest as Casilio and Leitch as it served as Casilio, Leitch and CLI's SEC registered investment advisor firm in exchange for 25 percent of the revenue generated by Casilio and Leitch from client accounts. Both CLI and Concert obtained revenue to the extent that Casilio and Leitch obtained clients, and thus the reputation of Casilio and Leitch as financial and investment advisors was critical to the profitability of CLI and Concert.

Respondents assert that neither CLI nor Concert "had any interest" in the claims raised in the FINRA arbitration by Casilio and Leitch, as the arbitral claims were "individual claims[s] owned only by Mr. Casilio and Mr. Leitch against John Valentine as their former employer." The findings of the arbitration panel belie respondents' characterization of the comity of interests between Casilio, Leitch, CLI and Concert. The

14

arbitration panel determined that Valentine engaged in various methods to interfere with Casilio and Leitch's new business by libeling them to customers and prospects, directing or coercing others to file derogatory reports regarding Casilio and Leitch to damage their BrokerCheck records, encouraging customers to file FINRA arbitration claims to extract settlement funds, and conspiring to publish defamatory news stories about Casilio and Leitch. These actions interfered with existing and prospective client sources by deterring persons from doing business with Casilio and Leitch. As both CLI's and Concert's revenues were dependent on success of Casilio and Leitch, their financial interests were joined. When Casilio and Leitch prosecuted their case in the arbitration to redress the damage to their reputations by seeking expungement of the client complaints generated at Valentine's behest and by damages for Valentine's interference with their newly formed investment company, they advanced the interests of CLI and Concert as well their own. CLI and Concert thus should reasonably have expected to be bound by the arbitration award. We conclude that, as described in *Cal Sierra*, CLI and Concert were in privity with Casilio and Leitch.

### 2. *Final Judgment*

The doctrines of claim preclusion and issue preclusion require that there be a final judgment on the merits in the first suit. (*DKN Holdings*, *supra*, 61 Cal.4th at pp. 824-825.) A prior judgment confirming an arbitration award may bar a subsequent lawsuit on the same cause of action. (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 824, fn. 2 (*Vandenberg*); see *Brinton v. Bankers Pension Services, Inc.* (1999) 76 Cal.App.4th 550, 557-558 [finding that a nonparty to an arbitration can assert a claim preclusion defense based on the arbitration award where its liability was derivative of that of a party to the arbitration].)

Citing *Vandenberg*, Respondents argue that CLI and Concert were not bound by the arbitration award because they were not parties to the arbitration. (*Vandenberg*,

15

*supra*, 21 Cal.4th at p. 824.)  Examining the contractual nature of private arbitration, in *Vandenberg*, the California Supreme Court found that "a private arbitration award, even if judicially confirmed, can have no collateral estoppel effect in favor of third persons unless the arbitral parties agreed, in the particular case, that such a consequence should apply."  (*Id.* at pp. 833-834.)

We conclude that *Vanderberg* is inapplicable here for several reasons.  First, the court limited its decision solely to the question of whether issue preclusion raised by a third party bars the relitigation of a fully adjudicated issue arising from a private arbitration:  "Our holding is narrowly circumscribed.  Nothing in our decision imposes or implies any limitations on the strict res judicata, or 'claim preclusive,' effect of a California law private arbitration.  [Citations.]  We also do not address the circumstances, if any, in which a private arbitration award may have 'issue preclusive' effect in subsequent litigation between the *same parties* on different causes of action." (*Vandenberg*, *supra*, 21 Cal.4th at p. 824, fn. 2.)  Second, the court addressed only the collateral estoppel effects arising from an arbitration governed by California's statutory scheme governing private arbitration in Title 9 of the Code of Civil Procedure.  "No party has suggested the arbitration here at issue is governed by the Federal Arbitration Act (9 U.S.C.A. § § 1-14) (FAA), and we have no occasion to consider whether application of the FAA would alter our ruling."  (*Ibid*.)  The arbitration conducted here was governed by the FINRA regulatory scheme, and was enforceable under the Federal Arbitration Act, arguably removing it from the reach of the court's holding.  (9 U.S.C. § 1 et. seq.; *Valentine Capital Asset Management, Inc. v. Agahi*, *supra*, 174 Cal.App.4th at p. 613.) In *Vandenberg*, the court gave "weight to the voluntary, contractual, and informal nature of private arbitration, and to the consequent reasonable expectations of the arbitral parties."  (*Vandenberg*, at p. 835.)  Here, a three-member panel took evidence under a

16

regulatory scheme that was compulsory, rendering a decision with detailed findings after ten days of hearings.

Third, *Vandenberg* addressed the circumstance where a *third party* seeks to reap the issue preclusive benefit of a determination against a party to an arbitration. "In such cases, the doctrine [of issue preclusion] is asserted not to protect one who has already once prevailed against the same opponent on the same cause of action, but simply to gain vicarious advantage from a litigation victory won by another." (*Vandenberg*, *supra*, 21 Cal.4th at p. 833.) The court concluded that the application of issue preclusion under these circumstances would encourage vexatious litigation, and discourage parties from entering arbitration agreements, thus undermining California's policy of encouraging the alternative resolution of disputes through the arbitration process. Here, Valentine, a party to the arbitration, argues that the issues and/or claims raised by the other parties to the arbitration which have been redressed in the arbitration decision and award, should limit the recovery of the privies of those same arbitral parties. Such a preclusion claim would be foreseeable to the parties to the arbitration and their privies, while, as noted by the *Vandenberg* court, a preclusion claim forwarded by a third party seeking to obtain the benefit of those proceedings would not be foreseeable. Here, no third party seeks to utilize the arbitration proceedings for preclusive effect. Under these circumstances, we determine that the judgment confirming the FINRA arbitration award can have preclusive effect in the subsequent civil action on appeal here.

### 3. *Claim Preclusion or Issue Preclusion*

Although Valentine contends that both claim preclusion and issue preclusion should apply here, the gist of his argument is that the FINRA arbitration award and the civil jury award addressed the same subject matter based on the same nucleus of facts. He thus seeks to bar additional damages for the conduct that was litigated and remedied in the 2014 FINRA award and judgment. Respondents contend that the claims

prosecuted by Casilio and Leitch in the FINRA arbitration, were "individual claim[s] owned only by [Casilio] and [Leitch] against John Valentine as their former employer." They further assert that these claims were not the equivalent of the causes of action that respondents alleged in their cross-complaint, and that the requirements for claim preclusion are not satisfied. They also appear to argue that the claims raised by Casilio and Leitch in the FINRA arbitration are not sufficiently similar to warrant issue preclusive effect.[11]

Although the parties discuss claim preclusion and issue preclusion as interchangeable theories, as discussed, *ante*, there are differences between the two preclusion doctrines. "If claim preclusion is established, it operates to bar relitigation of the claim altogether." (*DKN Holdings*, *supra*, 61 Cal.4th at p. 824.) Respondents are correct that claim preclusion is applicable only if the subsequent litigation between the parties or their privies involves the same cause of action. (*Ibid*.) "Whenever a judgment in one action is raised as a bar to a later action under [claim preclusion], the key issue is whether the same cause of action is involved in both suits. California law approaches the issue by focusing on the 'primary right' at stake: if two actions involve the same injury to the plaintiff and the same wrong by the defendant then the same primary right is at stake even if in the second suit the plaintiff pleads different theories of recovery, seeks different forms of relief and/or adds new facts supporting recovery." (*Eichman v. Fotomat Corp.* (1983) 147 Cal.App.3d 1170, 1174.) "Under the 'primary rights' theory adhered to in California, there is only a single cause of action for the invasion of one

_____

[11] We note that in the trial court the parties adopted positions inconsistent with those described above. This raises the issue of whether judicial estoppel applies here. (See *Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986 [the doctrine of judicial estoppel, application of which is discretionary, precludes a party from obtaining an advantage by taking one position, then seeking another advantage through a second, incompatible position].) Because each party has asserted positions at least partially at variance with their contentions in the trial court, we decline to exercise our discretion under this doctrine.

primary right and the harm suffered is the significant factor. [Citations.] A primary right is the right to be free of a particular injury. [Citation.] 'The cause of action is the right to obtain redress for a harm suffered, regardless of the specific remedy sought or the legal theory (common law or statutory) advanced.' [Citation.]" (*Cal Sierra*, *supra*, 14 Cal.App.5th at p. 675.)

We conclude that the third-party claims filed by Casilio and Leitch and adjudicated by the arbitration panel in the FINRA action are not the same as the causes of action in Respondents' third amended cross-complaint such that the causes of action should be entirely barred based on precepts of claim preclusion. The causes of action in the civil action address harm that extends beyond that contemplated in the FINRA arbitration because Respondents seek redress both for Valentine's pre-arbitration conduct and for the actions of Valentine and VCAM that post-date the arbitration. The jury considered this post-arbitration conduct as part of its determination of liability. Although Valentine minimizes the evidence of his actions taken after the FINRA arbitration award issued, Respondents are entitled to a determination of damages resulting from the jury's liability finding based on those facts. As a result, to give claim preclusive effect to bar the causes of action entirely would be violative of that doctrine. (*DKN Holdings*, *supra*, 61 Cal.4th at p. 824.).

However, we agree with Valentine that the issue of the harm he inflicted on Casilio and Leitch and their privies before the date of the arbitration was fully resolved by the FINRA panel and should be given preclusive effect. The record establishes that the third-party FINRA claim and Respondent's cross-complaint sought recovery for the same economic losses suffered as a result of Valentine's pre-arbitration conduct. Both the FINRA arbitration panel's findings and the cross-complaint's allegations are premised on the theory that Valentine used various means, including disseminating false information, filing unfounded claims, and otherwise maligning Casilio and Leitch, to deter potential investors from using their services. This conduct caused the economic

19

losses suffered by CLI and Concert as privies to Casilio and Leitch through loss of potential business and revenue. The allegations of the harm suffered by Respondents in the cross-complaint repeat in substance the findings of the arbitration panel, albeit in more detail. We thus determine that the doctrine of issue preclusion limits the redress Respondents may seek in damages to the harm suffered from Valentine after the date of the arbitration award.[12]

We further conclude that the trial court erred when it instructed the jury that the limitation precluding Casilio and Leitch from recovering for damages based on conduct Valentine engaged in prior to the arbitration date did not also limit possible damages awarded to CLI and Concert. It is clear from the record that the jury was thoughtfully engaged in the deliberative process,[13] and we presume it followed the trial court's instructions. (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 953, disapproved on another ground in *White v. Ultramar* (1999) 21 Cal.4th 563, 574, fn. 4.; *City of Ripon v. Sweetin* (2002) 100 Cal.App.4th 887, 901.) To the extent the award includes damages for pre-arbitration conduct, it is barred by the doctrine of issue preclusion and must be reversed.

## B. *Substantial Evidence Does Not Support the Damages Award Based on Post-Arbitration Conduct*

Respondents contend that even if the trial court committed instructional error as discussed, *ante*, substantial evidence supports the jury's verdict based on Valentine's and

---

[12] Although it is not well developed in the briefing, Valentine argues that this preclusion should extend to VCAM as "privity exists between Valentine and his wholly owned firms." Appellants conceded that Valentine and VCAM are in privity. As a result, the preclusive effect of Valentine's conduct adjudicated in the arbitration award applies to VCAM as well.

[13] Notably, as described in section I.3., *ante*, when questions arose about the jury's potential confusion concerning damages against Valentine and VCAM, the jury made it clear that it fully considered the issue and made a purposeful decision about its award.

VCAM's post-arbitration conduct such that the judgment should be affirmed. We disagree and determine that there is not substantial evidence to support the jury's award of compensatory damages based solely on such post-arbitration actions.

We affirm a trial court's judgment on any correct basis supported by the record, whether or not relied upon by the trial court. (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1268 (*ASP Properties*), citing *Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329.) We review the award of damages—a finding of fact—for substantial evidence. (See *ASP Properties*, at p. 1265.) "Under the substantial evidence standard of review, 'we must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.] [¶] It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact. Our authority begins and ends with a determination as to whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, in support of the judgment. Even in cases where the evidence is undisputed or uncontradicted, if two or more different inferences can reasonably be drawn from the evidence this court is without power to substitute its own inferences or deductions for those of the trier of fact, which must resolve such conflicting inferences in the absence of a rule of law specifying the inference to be drawn. . . . [Citations.]' [Citation.]" (*Id*. at p. 1266.)

With respect to evidence of Valentine and VCAM's post-arbitration conduct, Casilio and Leitch testified that the publication of the March 2015 article accusing Casilio and Leitch of stealing information and likening their conduct to elder abuse and other notable cyber-attacks caused CLI to lose revenue obtainable through clients who were dissuaded by the publication from contracting CLI's services. They estimated this loss at $400,000 based on the loss of two clients with the conservative estimate that clients remain with CLI for 10 years on average. Casilio indicated that some clients stay

21

with advisors for longer, up to 20 to 22 years, a fact that could support a damages award greater than $400,000.

However, although the jury heard evidence of substantial lost revenue from the publication of the March 2015 article, and were instructed that they could consider only post-arbitration conduct in calculating Casilio and Leitch's damages, they awarded just $1 each to Casilio and Leitch. The jury awarded CLI $461,500 of compensatory damages against Valentine and separately against VCAM. Viewing the evidence in the light most favorable to the verdict and judgment, it is not reasonable to infer that the jury found CLI and Concert suffered post-arbitration harm compensable by hundreds of thousands of dollars in damages, but found nominal damages appropriate based on the same evidence for Casilio and Leitch as individuals. We also note that, in combination, the jury awarded CLI a total of $923,000 of compensatory damages against Valentine and VCAM. This amount is not significantly greater than the $800,000 in compensatory damages awarded to Casilio and Leitch in the arbitration, suggesting that the jury based its compensatory damages award on evidence of Valentine's conduct both before and after the arbitration. In short, we conclude the jury's award of compensatory damages to CLI against Valentine and VCAM in the amount of $461,500 each could not reasonably represent solely post-arbitration damages, meaning those incurred since June 2014.

Similarly, we determine that there is no evidence from which we can reasonably deduce that the jury awarded $33,750 to Concert Wealth Management based solely on events that occurred after the FINRA arbitration. The owner of Concert testified that the business lost $500,000 in annual revenue over the four years the litigation had been pending, for a total of $2 million. The sum of $33,750 awarded by the jury does not appear to be logically tethered to any identifiable post-arbitration events. For these reasons, we conclude that the jury's award of damages was not supported by substantial evidence of Appellants' post-arbitration conduct.

22

Although substantial evidence does not support a determination that the jury's compensatory damages award was based only on post-arbitration conduct, there is evidence indicating that damages based on post-arbitration harm could be more than nominal. Casilio projected that after the publication of the article in March 2015, the company continued to lose business opportunities because VCAM persisted in publishing false information about CLI and its owners, resulting in the loss of at least $400,000 in revenue. Given the trial court's error in instructing the jury regarding how it could award damages for post-arbitration conduct, it is impossible to determine whether the jury would have entered a different award if given a proper instruction. Thus, we will reverse the judgment and remand the matter to the trial court for retrial to determine appropriate damages based on evidence of Valentine's and VCAM's post-arbitration conduct.[14]

### III. DISPOSITION

The November 5, 2015 judgment is reversed. The matter is remanded to the trial court for retrial to determine the appropriate damages based on conduct occurring after the FINRA arbitration.

---

[14] As we are reversing the judgment and remanding the matter to the trial court, we need not consider Appellants' contention that the jury's verdicts against both Valentine as an individual and VCAM as an entity violated the policy against double recovery. Nor need we consider the propriety of evidentiary rulings made by the trial court during the trial.

_____
Greenwood, P. J.

WE CONCUR:

_____
  Elia, J.

_____
  Grover, J.

Valentine et al. v. Concert Global Inc. et al.
No. H043237